59 CCPA

**The UNITED STATES**

**v.**

**STAR INDUSTRIES, INC.**

**Customs Appeal No. 5454.**

United States Court of Customs and Patent Appeals.

June 22, 1972.

L. Patrick Gray, III, Asst. Atty. Gen., Alan S. Rosenthal, William D. Appler, Washington, D. C., for the United States.

Barnes, Richardson & Colburn, New York City, attorneys of record, for appellee; J. Bradley Colburn, James F. Donnelly, Irving Levine, New York City, of counsel.

Before RICH, ALMOND, BALDWIN, and LANE, Judges and RE, Judge, United States Customs Court, sitting by designation.

BALDWIN, Judge.

This appeal is from the decision and judgment of the United States Customs Court, Third Division,[1] sustaining a protest by Star Industries against the amount of duty assessed on brandy imported from Spain. The brandy had been classified under item 945.16, TSUS. The Customs Court ruled that it should

have been classified under item 168.20, TSUS. The pertinent parts of the Tariff Schedules read as follows:

Schedule 1.—Animal and Vegetable Products
Part 12.—Beverages
\* \* \* \* \*
Subpart D. Spirits, Spirituous Beverages and Beverage Preparations
\* \* \* \* \* \*
Brandy:
168.20 In containers each holding not over 1 gallon \* \* \* __$1.25 per gal.
\* \* \* \* \* \*

APPENDIX TO THE TARIFF SCHEDULES
\* \* \* \* \* \*
Part 2. Temporary Modifications Proclaimed Pursuant to Trade-Agreements Legislation
\* \* \* \* \* \*
Subpart B. Temporary Modifications Pursuant to Section 252 of the Trade Expansion Act of 1962
\* \* \* \* \* \*
945.16 Brandy, valued over $9.00 per gallon (provided for in items 168.20 and 168.22)
\* \* \* ................ $5 per gal.

At issue in this case is the validity of Presidential Proclamation No. 3564,[2] which brought item 945.16 into existence. That proclamation reads in pertinent part as follows:

By The President of the United States of America

A Proclamation

Whereas the European Economic Community maintains unreasonable import restrictions upon imports of poultry from the United States;

Whereas such unreasonable import restrictions directly and substantially burden United States commerce;

Whereas products of the European Economic Community receive benefits of trade agreement concessions made by the United States;

Whereas it is consistent with the purposes expressed in Section 102 of the Trade Expansion Act of 1962 (19 U.S.C. 1801) for the United States to suspend the application of the benefits of certain of those trade agreement concessions;

Whereas, having due regard for the international obligations of the United

---

1. 65 Cust.Ct. 662, 320 F.Supp. 1018, C.D. 4155 (1970).

2. 77 Stat. 1035 (1963).

States, particularly paragraph 3 of Article XXVIII of the General Agreement on Tariffs and Trade * * * requiring any suspension of trade agreement concessions to be made on a most-favored-nation basis, I am taking steps to suspend, on a most-favored-nation basis, certain trade agreement concessions in the United States schedules to that Agreement; and

Whereas rates of duty suspended by this proclamation will not be required or appropriate to carry out any trade agreement on and after January 7, 1964:

Now, Therefore, I, Lyndon B. Johnson, President of the United States of America, acting under the authority vested in me by the Constitution and statutes of the United States of America, including Section 252(c) of the Trade Expansion Act of 1962 (19 U.S. C. 1882(c)) and Section 350(a) (6) of the Tariff Act of 1930, as amended (19 U.S.C. 1351(a) (6)), and in order to suspend the application of the benefits of certain trade agreement concessions, do hereby proclaim (until such time as the President of the United States of America otherwise proclaims)—

(1) the termination of that part of any prior proclamation which proclaims rates of duty inconsistent with those provided for in the amendment made by paragraph (2) of this proclamation; and

(2) the amendment of the Tariff Schedules of the United States (28 F. R. 8599, as corrected, 28 F.R. 9131)

by inserting under the heading "Subpart B" of Part 2 of the Appendix thereto the following:

| * | * | * | * | * | * |

945.16   Brandy, valued over $9.00 per gallon (provided for in items 168.20 and 168.22) * * * $5 per gal.

The events surrounding Proclamation No. 3564 are referred to in international trade circles as "the chicken war." [3] Briefly, it appears that during the late fifties and early sixties United States poultry producers had found a rapidly burgeoning market for frozen poultry in Germany. In 1962, however, the German import fees on poultry were replaced by import fees promulgated by the European Economic Community (EEC). The EEC import fees were about three times as high as the German fees they replaced,[4] which adversely affected further importation of U. S. poultry into Germany. The action taken by the President in issuing Proclamation No. 3564 was in the nature of the compensatory withdrawal of previously proclaimed tariff concessions. The higher rates were calculated to increase the duty on EEC goods in an amount which would approximately balance the higher EEC import fees.[5]

Although Spain is not a member of the EEC, the brandy at bar was charged the item 945.16 rate because that rate was instituted on a most-favored-nation basis. The products included under Proclamation No. 3564 were apparently chosen to be those imported almost exclusively from the member nations of the EEC.[6]

3. For a discussion of the history of the proclamation, see Walker, *Dispute Settlement*: The Chicken War, 58 Am.J. Int'l L. 671 (1964) [hereinafter Walker].

4. Walker, *supra*, 58 Am.J.Int'l L. at 671.

5. Walker, *supra*, 58 Am.J.Int'l L. at 673–685; J. Jackson, World Trade and the Law of GATT, 174–175, 325–326 (1969) [hereinafter Jackson]; Comment, Retaliation in International Trade: The Scope of Executive Discretion in Its Choice of Weapons, 4 Law & Pol.Int'l

Bus. 156, 159 (1972) [hereinafter Comment].

6. See 28 Fed.Reg. 8066 (1963). In addition to brandy, the rates of duty on potato starch, dextrine and modified starches, and trucks valued at $1000 or more were increased by Proclamation No. 3564. According to Walker, *supra*, the overall effect of the proclamation on countries which are not members of the EEC has been minor. 58 Am.J.Int'l L. at 681.

The statutes specifically relied on for authority in Proclamation No. 3564 read as follows:

Trade Expansion Act of 1962, Section 252(c) (19 U.S.C. § 1882(c)):

(c) Whenever a foreign country or instrumentality, the products of which receive benefits of trade agreement concessions made by the United States, maintains unreasonable import restrictions which either directly or indirectly substantially burden United States commerce, the President may, to the extent that such action is consistent with the purposes of section 1801 of this title, and having due regard for the international obligations of the United States—

(1) suspend, withdraw, or prevent the application of benefits of trade agreement concessions to products of such country or instrumentality, or

(2) refrain from proclaiming benefits of trade agreement concessions to carry out a trade agreement with such country or instrumentality.

Tariff Act of 1930, Section 350(a)(6) (19 U.S.C. § 1351(a) (6)):

(6) The President may at any time terminate, in whole or in part, any proclamation made pursuant to this section.

Article XXVIII, paragraph 3 of the General Agreement on Tariffs and Trade (GATT),[7] stated in the proclamation to require suspension of concessions to be on a most-favored-nation basis, reads as follows:

### Article XXVIII

#### Modification of Schedules

\*    \*    \*    \*    \*    \*

3. (a) If agreement between the contracting parties primarily concerned cannot be reached before 1 January 1958 or before the expiration of a period envisaged in paragraph 1 of this Article, the contracting party which proposes to modify or withdraw the concession shall, nevertheless, be free to do so and if such action is taken any contracting party with which such concession was initially negotiated, any contracting party determined under paragraph 1 to have a principal supplying interest and any contracting party determined under paragraph 1 to have a substantial interest shall then be free not later than six months after such action is taken, to withdraw, upon the expiration of thirty days from the day on which written notice of such withdrawal is received by the CONTRACTING PARTIES, substantially equivalent concessions initially negotiated with the applicant contracting party.

(b) If agreement between the contracting parties primarily concerned is reached but any other contracting party determined under paragraph 1 of this Article to have a substantial interest is not satisfied, such other contracting party shall be free, not later than six months after action under such agreement is taken, to withdraw, upon the expiration of thirty days from the day on which written notice of such withdrawal is received by the CONTRACTING PARTIES, substantially equivalent concessions initially negotiated with the applicant contracting party.

The Customs Court held that the President was not authorized to suspend trade agreement concessions on a most-favored-nation basis under 19 U.S.C. § 1882(c). In its view, only selective action against the instrumentality which maintains unreasonable import restrictions is authorized by that section. The court did not consider that the proclamation could be upheld on the basis of "due regard for the international obligations of the United States," for in its opinion most-favored-nation treatment was not required by Article XXVIII(3) of the GATT. The court rejected appellant's argument that the proclamation was authorized under the termination power of section 1351(a) (6), holding that:

[A]ny limitations written into section 1882(c) affecting the scope of Presi-

7. October 30, 1947, 61 Stat. A3, T.I.A.S. No. 1700.

dential action taken under that statute would be determinative of the scope of the termination power of section 1351(a) (6) exercised in conjunction with the section 1882(c) action or in aid thereof.

Having thus determined that the President had exceeded his authority in issuing Proclamation No. 3564, the court held the proclamation invalid and void.

In addition to matters discussed below, appellant takes issue with the Customs Court's holding with respect to section 1351(a) (6). However, with the view we take of the case, it is unnecessary to reach that issue.

## Opinion

With regard to the reliance stated in Proclamation No. 3564 on Article XXVIII(3) of the GATT, the Customs Court stated:

> As we read paragraph 3 of Article XXVIII of GATT it does not *require* suspension of trade agreement concessions on a most favored nation basis. In fact, favored nation treatment is not even mentioned or implied in paragraph 3. Under paragraph 3 a country having a principal supplying interest or a substantial interest is permitted to withdraw *substantially equivalent concessions initially negotiated with the applicant contracting party*. We construe this language merely to authorize reciprocal action on the part of contracting parties to GATT with respect to modification of tariff concessions, following a break down in negotiations and unilateral withdrawal of concessions by a contracting party.

The last two sentences of the above quote, though correct, are not pertinent to the question of whether unilateral withdrawal of concessions under Article XXVIII(3) must be made on a most-favored-nation basis. We are therefore left with the court's observation that that Article does not specifically mention most-favored-nation treatment, and its conclusions that such treatment is not implied or otherwise required by that Article.

Appellant contends that Article XXVIII(3) must be read within the context of the entire agreement and points to Article I of the GATT, which provides in pertinent part:

### Article I
### General Most-Favoured-Nation Treatment

1. With respect to customs duties and charges of any kind imposed on or in connection with importation or exportation * * *, any advantage, favour, privilege or immunity granted by any contracting party to any product originating in or destined for any other country shall be accorded immediately and unconditionally to the like product originating in or destined for the territories of all other contracting parties.

Appellant also argues that:

> The very nature of Article XXVIII requires that actions taken under it be on a most favored nation basis. Such concessions cannot be withdrawn only as to a particular party. If withdrawn, the result is that they are also withdrawn as to all parties, *i.e.*, those who obtained the concessions on a most favored nation basis. [Footnote omitted.] Any arrangement whereby the particular concessions are continued as to all such other parties, but not the parties with which they were originally negotiated, is clearly not contemplated by Article XXVIII. In this case, Spanish brandy benefited from the original concession made to France, a member of the EEC, and there is little reason to continue the concession once it has been terminated as to the original contracting party.

■ Turning to the language of Article XXVIII(3), adverse effects on a plurality of countries from a unilateral withdrawal of concessions were clearly contemplated in this provision. A compensating mechanism is therein provided for three classes of countries which

would be adversely effected by a unilateral withdrawal of a concession on a particular commodity, *i.e.*, the country with which the concession was originally negotiated, a country having a principal supplying interest in the commodity, and a country having a substantial interest in the commodity.[8] Article XXVIII(3) is therefore at least not inconsistent with the most-favored-nation principle.[9]

■ Reading Article XXVIII(3) in context with the rest of the GATT, it is clear that conformity with the most-favored-nation principle is required under that Article. One of the primary purposes of the GATT, recited in its preamble was "the elimination of discriminatory treatment in international commerce." To this end, the most-favored-nation principle was embodied in Article I, quoted *supra*, and in numerous other GATT Articles. The principle has been described as the heart of the GATT.[10] The GATT does contain some exceptions to the principle, but they are few in number and, when they do appear in the instrument, they are clearly spelled out.[11] There is nothing in Article XXVIII(3) which would indicate that that Article was intended to be an exception to the principle.

Moreover, the "negotiative" history of the Article clearly establishes that the negotiators intended to have the most-favored-nation principle govern actions under it.[12] One of the major changes made in the early drafting of the Article was the substitution of the phrase "withdraw the concession" for the phrase "suspend the application to the trade of the contracting party taking such action of substantially equivalent concessions," the intent being to change the effect of the Article from a discriminatory action to a nondiscriminatory one.[13] Thus should there be any doubt that nondiscriminatory (most-favored-nation) action was required by Article XXVIII(3), the negotiative history of the Article would settle that doubt. Nielsen v. Johnson, 279 U.S. 47, 52, 49 S.Ct. 223, 73 L.Ed. 607 (1929) and cases cited; W. Bishop, International Law, 171–72 (2d ed. 1962).

The question remains whether 19 U.S.C. § 1882(c) allows the President to take other than selective or discriminatory action, even when he determines that nondiscriminatory action is required by our international obligations. The Customs Court referred to 19 U.S.C. § 1881, which provides:

§ 1881. Most-favored-nation principle.

Except as otherwise provided in this subchapter, in section 1351 of this title, or in section 401(a) of the Tariff Classification Act of 1962, any duty or other import restriction or duty-free treatment proclaimed in carrying out any trade agreement under this subchapter or section 1351 of this title shall apply to products of all foreign countries, whether imported directly or indirectly.

The court considered that section 1881, when read together with the language in section 1882(c) specifying action to be

---

8. See GATT, Annex I, Notes and Supplementary Provisions, Notes 5–7 to Article XXVIII(1).

9. An argument can be made that most-favored-nation treatment is implied in the language of Article XXVIII(3). *Cf.* Comment, *supra*, 4 Law & Pol.Int'l Bus. at 164–65; Walker, *supra*, 58 Am.J. Int'l L. at 681–682.

10. W. Bishop, International Law, 158 (2d ed. 1962). See generally Jackson, *supra*, at 249–73; GATT Secretariat, The Most-favoured-nation Clause in GATT, 4 J. World Trade L. 791 (1970).

11. See GATT Secretariat, *supra*, 4 J. World Trade L. at 795–801; Jackson, *supra*, at 270–272.

12. See 18th Meeting of the Tariff Agreement Committee, U.N.Doc. EPCT/TAC/PV. 18 (1947). This is one of a series of documents which have been called the "Primary Source for Drafting of GATT." Jackson, *supra*, at 904.

13. *Id.* The latter phrase or its equivalent has been retained in sections of the GATT which do provide exceptions to the most-favored-nation principle. See, *e. g.*, GATT Articles XVIII(21), XIX(3)(a) and XXIII(2).

taken with respect to "products of such country or instrumentality" or "a trade agreement with such country or instrumentality," created an exception to the most-favored-nation principle in 1882(c) proceedings. Thus the court did not specifically rule on the provisions of section 1882(c) which limit the action the President may take "to the extent that such action is consistent with the purposes of section 1801 of this title, and having due regard for the international obligations of the United States * * *."

The purposes referred to are listed in 19 U.S.C. § 1801 as follows:

(1) to stimulate the economic growth of the United States and maintain and enlarge foreign markets for the products of United States agriculture, industry, mining, and commerce;

(2) to strengthen economic relations with foreign countries through the development of open and *nondiscriminatory* trading in the free world; and

(3) to prevent Communist economic penetration. [Emphasis added.]

Thus the use of section 1882(c) on a nondiscriminatory or most-favored-nation basis would not be inconsistent with the purposes referred to in that section.

With regard to the apparent conflict between our international obligations under the GATT and the statements in section 1882(c) that action is to be taken against the country or instrumentality which maintains the unreasonable import restrictions, we find the following excerpt from the legislative history of the section most enlightening:

Subsections (a) and (b) of section 252 of the bill together authorize action against burdensome foreign import restrictions. They do not, however, authorize action against foreign

import restrictions which, though they may be legally justifiable, impose a substantial burden upon U.S. commerce. The amendment provides that whenever a country which has received benefits under a trade agreement with the United States maintains unreasonable import restrictions which burden U.S. commerce either directly or indirectly, the President may withdraw existing trade agreement benefits or refrain from proclaiming any negotiated trade agreement concessions on such products. Under this subsection the President may act only to the extent consistent with the purposes of the act and in exercising this authority he must take into consideration the international obligations of the United States. Thus, the amendment would not authorize any indiscriminate breach of international obligations of the United States such as *our most favored nation treaties* with regard to the products of other countries.[14] [Emphasis added.]

The amendment referred to is the Senate amendment to H.R. 11970 which added subsection (c) to section 252 of the Trade Expansion Act of 1962 (19 U.S.C. § 1882).

■ Appellee relies on other legislative history which indicates an intent to provide the President with strong measures to combat foreign trade discrimination. We are of the opinion that the interpretation of section 1882(c) embodied in Proclamation No. 3564 fully complies with that intent. Under that interpretation, section 1882(c) provides for the denial of most-favored-nation treatment where the President decides upon that course "having due regard for the international obligations of the United States."[15] The proclamation indicates in the present case that the Presi-

14. S.Rep.No.2059, 87th Cong. 2d Sess. 2–3 (1962), U.S.Code Cong. & Admin.News. p. 3112.

15. Such denial might be appropriate, for example, in cases arising under one of

the GATT Articles which allows an exception to the most-favored-nation principle, such as Article XXIII. Cf. Comment, *supra,* 4 Law & Pol.Int'l Bus. at 165–166.

dent did not choose that course because it would have been inconsistent with our international obligations. However, the measures taken under the proclamation were sharply focused on the instrumentality which was maintaining the unreasonable import restrictions—the EEC. Thus the legislative intent to take strong measures against those who maintain unreasonable import restrictions was upheld, and at the same time we did not breach our international obligations.

For the above reasons, we find that the President did not exceed the authority granted him under section 252(c) of the Trade Expansion Act of 1962 (19 U.S.C. § 1882(c)) in issuing Proclamation No. 3564. That proclamation is therefore valid and the judgment of the Customs Court is reversed.

Reversed.