(A.R.D. 186)

UNITED STATES *v.* ERB & GRAY SCIENTIFIC, INC.

Entry No. 04982.

Second Division, Appellate Term

(Decided March 30, 1965)

*John W. Douglas*, Assistant Attorney General (*Charles P. Deem*, trial attorney), for the appellant.

*Glad & Tuttle (Edward N. Glad* of counsel) ; *Schultheis, Laybourne & Dowds (Everett B. Laybourne* of counsel), associate counsel; for the appellee.

Before LAWRENCE, RAO, and FORD, Judges

RAO, Judge: This is an application for review of a decision and judgment, *Erb & Gray Scientific, Inc.* v. *United States* (52 Cust. Ct. 583, Reap. Dec. 10768) sustaining the claimed value of a certain electronic microscope, exported from Japan on or about November 25, 1961. This merchandise, which was invoiced as one set, Hitachi Electronic Microscope, Model HU–11, was entered at the invoiced value of $13,500 net, packed, and appraised at $17,000 each, net, packed. The difference between these two values of $3,500 was described on the commercial invoice as "New York Office Service & Operation Fee." It is shown by the record to represent the expenses of the maintenance of the New York office of the shipper of the involved merchandise, and is concededly the only disputed item in this proceeding. It is otherwise agreed that export value, as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956 [1] is the proper statutory basis of value to be here invoked, and that if said sum of $3,500 was properly included in the export value, the appraised value should be sustained; if not, the claimed value was correct.

The trial court was of opinion that the issue of whether or not the sum of $3,500 should be included in statutory export value could readily be resolved by an analysis of the facts and its analysis thereof prompted the conclusion that the questioned fee formed no part of the export value of the merchandise undergoing appraisement.

The record, as adduced before the trial court, consisted of the oral testimony of one Carl H. McBain, president of the appellee at the time of importation, together with certain documentary evidence more particularly described as follows:

Plaintiff's collective exhibit 1, an affidavit of T. Ikeda, manager of the Scientific Instruments Division of the Japanese exporter of the instant merchandise, the firm of Nissei Sangyo Co., Ltd.

Plaintiff's exhibit 2, a copy of an order confirmation of Nissei Sangyo.

Defendant's collective exhibit A, a letter written by Mr. McBain to the Nissei Sangyo Co., Ltd.

Defendant's collective exhibit B, a report of Customs Agent James L. Light.

---

[1] EXPORT VALUE.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

Defendant's collective exhibit C consists of four order confirmations.

Defendant's collective exhibit D, a communication between Nissei Sangyo's New York office and the importer, as well as a letter from Mr. Ikeda, confirmed and accepted by Mr. McBain.

It appears from the record that the electronic microscope here involved is a highly technical, complex, scientific instrument which requires expert personnel to install, maintain, and service. The evidence establishes that installation takes between 2 and 3 weeks, and that the microscope is so complicated an instrument that it might take even an experienced technician a year of steady training to become familiar with its operation.

This microscope is manufactured in Japan by Hitachi, Ltd., and distributed by its subsidiary, Nissei Sangyo Co., Ltd., for domestic consumption and for exportation. During the period here involved, appellee, Erb & Gray Scientific, Inc., was the exclusive United States distributor of the Hitachi electron microscope. It started this arrangement by the importation during the year 1957 of a model designated as HU–10, for which it paid the sum of $12,500. Gradual modifications of the HU–10 resulted in the production of the HU–11, which is the instrument here under consideration.

There being no trained technicians available in this country for installation and servicing of the microscopes sold by appellee to its customers, laboratories, and universities, arrangements were made with Nissei Sangyo Co., Ltd., for furnishing experienced engineers for this purpose. In the course of the years between the initial importation and the present transaction, five Japanese service engineers were sent over to this country. Appellee paid each of them a monthly stipend of $400 at first, later, $600, plus travel expenses.

Some time after the first importation, Nissei Sangyo Co., Ltd., opened a small New York office for the following general purposes: To coordinate the activities of the Japanese engineers and supervise the performance of their work; to assist them with language problems; to effect a liaison between the importer and the Japanese factory; to resolve urgent difficulties; and to arrange transportation for the engineers and for consultants and administrative personnel to this country "to make sure that the program is being run properly as far as servicing and aftercare of the microscope."

Erb & Gray Scientific, Inc., continued to pay the monthly stipend and traveling expenses of the engineers, although payments were made through the New York office of Nissei Sangyo Co., Ltd.

Apparently, the expenses of the New York office became too great for the Japanese manufacturer and/or exporter to absorb, and appellee was advised that either the operations thereof would be suspended or an increase in the price of the microscope would be required. Since

appellee considered the New York office essential to the successful conduct of its business, it agreed to help with these expenses by paying $3,500 per instrument, on an instrument basis, to the New York office, and also subsequently consented to a *per se* increase of $1,000 per unit.

The record does not definitely establish when the sum of $3,500 was, in fact, paid, although it seems clear that the obligation to make the remittance arose when the order for the instrument was confirmed. And although three of the five order confirmations in evidence, no one of which relates to the instant merchandise, show a lump sum unit price inclusive of the New York office service fee, Mr. McBain testified that in 95 percent of the transactions the service fee was separately stated.

In reaching the conclusion that the disputed item was not a part of the export value of the merchandise at bar, the trial court found it to be a fee "paid by the plaintiff to the exporter or its subsidiary company in New York for the *installation* and servicing of the microscope after it was received by the plaintiff company in the United States and sold to one of its customers." [Italics supplied.] It was further held that the parties never intended that the fee for "installation and service charges" be considered a part of the purchase price. The court stated, in this connection:

* * * Throughout all the testimony, it clearly appears that there was a separation between the real sales price of the microscopes and the sum intended for payment to technicians to install and service the microscopes after they were received by the plaintiff in the United States and sold to its customers. The testimony further indicates that the responsibility for backing up the guarantee to the customers was upon the plaintiff company and not upon the manufacturer.

In my opinion, there was never any indication on the part of the manufacturer and the plaintiff that each individual microscope should cost more than $13,500. The arrangements for service charges covering installation and maintenance were really items incurred after the merchandise had become part of the commerce of the United States.

Cited in support of the court's conclusion to the foregoing effect was the case of *Brauner & Co.* v. *United States*, 44 Cust. Ct. 661, Reap. Dec. 9673, wherein was involved the question of whether a fee for engineering services and advice was properly included as an element in computing statutory cost of production of an acid distillation plant imported in a knocked-down condition. It was established in said case that the plant was of an extraordinarily complicated nature, which required expert technological skill in installing the equipment and in effectively utilizing it. The importing company, the purchaser of this equipment for its own use, contracted with the manufacturer and shipper for the services of engineers and other technicians to assist with the installation and to advise as to its optimum use. It appeared, however, that the importer was under no obligation to take these

additional services, and the subject equipment could have been purchased without the payment of the fee for technical assistance. Accordingly, it was held that the fee was not an element of the value of the equipment.

We are inclined to the view that the *Brauner* case is distinguishable from the instant situation, and that the $3,500 fee here in dispute should have been held to be a part of the export value of this merchandise.

It must be remembered that, in the *Brauner* case, the fee paid by the importer was an optional remittance for services which embraced installation, assistance, and technical advice. The item purchased was an acid distillation plant, in a knocked-down condition, and it was through a separate agreement that arrangements were made for the manufacturer's engineers to install the equipment and advise as to its proper use. These were services which the importer was under no obligation to purchase, and, conceivably, it could have supplied its own technicians or retained the services of domestic engineers.

This option was not available to the importer in the instant case. Once it prevailed upon the shipper to continue maintaining its New York office, it obligated itself to include, as part of the purchase price, the agreed contribution toward the expenses of that office. It became a condition of the purchase of each instrument, inasmuch as these microscopes were no longer sold to plaintiff at a price which did not include the said service fee.

It is reasonable to conclude that a seller of merchandise ordinarily computes all of his expenses before arriving at a price which he must receive for his merchandise, and it seems obvious that whether expenses are incurred in the country of exportation or in the country of importation, the price should cover them.

Actually, the New York office of Nissei Sangyo was no more than a convenience for the importer of the instant merchandise. It facilitated contacts between the two organizations, but it performed no specific functions with respect to the installation and servicing of any particular instrument. These latter items were paid for directly by the importer and, under the principle of the *Brauner* decision, *supra*, form no part of the value of the microscopes. But the general expenses of running an office in New York have no direct relationship to any given machine, and the decision to break down the cost between the microscope *per se* and the overhead of the New York operations must be considered an arbitrary arrangement not properly reflective of the export value of the subject merchandise.

Counsel for appellee cites *United States* v. *International Commercial Co., Inc.*, 28 Cust. Ct. 629, Reap. Dec. 8112, as authority for the proposition that costs, charges, and expenses accruing subsequent to

the time when the merchandise is in condition, packed ready for shipment to the United States, are not part of export value, even though included in the offered price, and urges that the expenses of the New York office of the exporter are in the category of subsequently accruing items. We are of the view, however, that, in the determination of export value, the emphasis is not upon when the issuable charges accrued, but upon what was the value in the principal market. If the disputed charges, whenever they may, in fact, accrue, are always included in the price at which the merchandise is sold, then they are part of that price and of the value which derives from that price. *United States* v. *Paul A. Straub & Co., Inc.,* 41 CCPA 209, C.A.D. 553; *Albert Mottola, etc.* v. *United States,* 46 CCPA 17, C.A.D. 689.

The price at which the Hitachi HU–11 microscope was sold to the importer herein was $13,500, plus $3,500, and this instrument was never sold for exportation to the United States in any other way. Accordingly, there seeems no escape from the conclusion that the so-called service fee was properly included in the appraiser's computation of the export value of the instant merchandise.

The court, therefore, makes the following findings of fact:

1. The merchandise covered by this application for review consists of one set, Hitachi Electronic Microscope, Model HU–11, exported from Japan on or about November 25, 1961.

2. The importer of said merchandise was the exclusive United States distributor thereof.

3. The involved electron microscope is a highly complicated and technical instrument, requiring the services of factory-trained engineers for installation and maintenance.

4. A so-called service fee in the sum of $3,500 paid on a per instrument basis for the operation of a New York office of the exporter to supervise the activities of said engineers, and for other purposes not directly connected to any specific microscope, is a part of the price at which the microscope is sold for exportation to the United States, and is, therefore, a part of the export value of said merchandise.

5. The said service fee was the only item disputed in this action.

The court, therefore, makes the following conclusions of law:

1. That export value, as that value is defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, is the proper basis for determining the value of the merchandise covered by this application for review.

2. That such value was the appraised value of $17,000, net, packed.

3. That the decision of the court below to the contrary should be reversed.

Judgment will be entered accordingly.