**SCHIEFFELIN & CO.**

v.

**UNITED STATES.**

**A.R.D. 317; Reappraisements R67/18958 and R67/18962**

United States Customs Court,
First Division, Appellate Term.
July 26, 1973.

Barnes, Richardson & Colburn, New York City (James S. O'Kelly, James F. Donnelly, and Hadley S. King, New York City, of counsel), for appellant.

Harlington Wood, Jr., Asst. Atty. Gen. (Bernard J. Babb, New York City, and Jordan J. Fiske, Trial Attys.), for appellee.

Before WATSON, MALETZ and RE, Judges.

MALETZ, Judge:

This is an application for review of the decision and judgment of the trial court in Schieffelin & Co. v. United States, 67 Cust.Ct. 549, R.D. 11759 (1971). Involved is the valuation of two shipments of cognac brandy which were produced in Cognac, France by Jas. Hennessy & Co. (Hennessy) and exported in September and November 1964 to Hennessy's selected purchaser in the United States, Schieffelin & Co. (Schieffelin), the importer-appellant here. The brandy in question was identified on the invoices as Bras Arme Cognac brandy and was bottled in tenth of a gallon sizes and packed 24 bottles per case.

The brandy was entered at the port of New York at the invoice price of $21.495 per case of 24 tenth size bottles, totalling 2.4 gallons per case. However, it was appraised by the government at $22.86 per case on the basis of export value as defined in section 402(b), Tariff Act of 1930, as amended (19 U.S.C. § 1401a(b)).[1]

It has been stipulated, and the trial judge found, that the government's appraised value was determined on the basis of the prices for *"similar"* cognac brandy bottled in equivalent sizes and produced in Cognac, France by Martell & Co. (Martell). In the trial court and here, appellant contends that the appraisement should have been based on the prices for *"such* merchandise" (i. e., Hennessy brandy) and that the correct export value of such brandy is represented by the prices shown on the invoices, i. e., $21.495 per case net packed.

By way of introduction, it is to be noted (as discussed below) that the appeal for reappraisement was prompted by the fact that, if allowed to stand, the appraising officer's return of value of $22.86 per case would result in the assessment of customs duties upon the brandy in question in the amount of $5 per gallon by virtue of what has become popularly known as the "Chicken War" Proclamation which is also discussed below. On the other hand, if the invoice price of $21.495 per case were determined to be the proper value, under the "Chicken War" Proclamation the brandy would be assessed duty of only $1.25 per gallon.

We turn now to the background history of the case and the pertinent facts, as

---

1. Sec. 402(b), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, provides:

(b) *Export Value.*—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

established by the record.[2]  Hennessy, the exporter here, is in the sole business of producing cognac brandy, most of which it sells for export.  Its two largest markets are the United States and Great Britain in that order.  Schieffelin is an importer of wines and spirits and a manufacturer of pharmaceuticals and cosmetics and has been the exclusive importer and distributor of Hennessy products in the United States and Puerto Rico since 1934.  There is no corporate or family relationship between the two companies.

During 1964, Hennessy sold its cognac brandy, as one of its managing directors testified, "at the full f. o. b. world price, less the usual discount which is normally to all our distributors the world over granted as a distributor discount" (R. 12).  From July 1963 through January 1965, the f. o. b. "world price" in the dollar zone, including the United States, for a case of 24 tenths of Bras Arme Cognac brandy was $25.40 f. o. b. French port.[3]  The distributor's discount granted to Schieffelin was 7½ percent, an allowance it had been receiving for over 30 years.

In return for the 7½ percent discount, Schieffelin was responsible for promoting the Hennessy brands and "marques" (various qualities of cognac brandy):  It maintained a coast-to-coast sales organization, and public relations and advertising departments.  As Schieffelin's president testified (R. 39):

* * * we view ourselves as having the responsibility for the welfare of the given product, * * * to be fully current with changes in the market and to adapt ourselves to those changes * * * in order that we can do the finest job of increasing the volume of sales of Hennessy Cognacs in the United States of America. * * *

Prior to January 1964, Hennessy did not have a net invoicing system.  Rather, it would mail out an invoice to Scheiffelin for the full f. o. b. price, accompanied by a separate "commission account" or credit note, listing the order number, the "gross value of brandy and packing", the "commission rate" of 7.5 percent, and the full amount of the commission.  Schieffelin would then remit payment for the invoice less the amount of the commission credited in the accompanying statement.  The 7½ percent was entered in Hennessy's books as a discount.

Hennessy also advertised in all of its foreign markets, including the United States.  It bore a large portion of the cost of advertising, either by granting an advertising allowance off the price of the merchandise, or by paying the actual advertising expenses as they were billed for them by the foreign importer.[4]

---

2.  The record consists of the testimony of one of Hennessy's managing directors, Gerald deGeoffre deChabrignac, and of Schieffelin's board chairman and president, William Jay Schieffelin, III, and three exhibits:  Exhibit A, a copy of a letter dated October 13, 1965, from Schieffelin to the Appraiser of Merchandise at the port of New York; exhibit B, a certified copy of a report, dated February 12, 1965, of Customs Representative Jacques L. Changeux of his investigation of Hennessy, to which are appended exhibits "A" through "L"; and exhibit C, a certified copy of a report, dated February 17, 1965, by the same Changeux of his investigation of Martell.

3.  An equivalent price list in pounds sterling was used in the sterling zone countries, except for sales to Great Britain and Italy, where Hennessy gave preferential prices, and to West Germany, Austria, Switzerland and Holland, where the brandy was imported only in casks.  The distributor's discounts varied according to local conditions in the foreign markets, but were higher than that given to Schieffelin.

4.  In Great Britain, the advertising expenses were incurred and paid for by Hennessy's British distributor, and Hennessy reimbursed it by means of two or three annual payments.  In Italy, an amount was deducted from each invoice to cover advertising and promotion expenses for the Italian market.  At the end of each year, the total of the deductions for advertising was compared to the total amount actually spent and, if not sufficient to cover the latter, Hennessy

With respect to the United States market, prior to 1964, Hennessy assumed a major part of the advertising expenses incurred in the promotion and sale of Hennessy brandies in this country. Under that arrangement, there were no "advertising allowance deductions"; instead, Hennessy and Schieffelin set up an annual advertising budget composed of two parts: one supplied by Schieffelin, the other supplied by Hennessy "direct". Schieffelin would handle all the advertising for Hennessy, and Hennessy, in turn, would reimburse Schieffelin for such expenditures by sending periodic remittances. Thus, during 1963, Hennessy remitted approximately $300,000 in bank drafts to Schieffelin which was entered in Hennessy's books as an "advertising expense".

It is to be added that prior to 1964, Hennessy and Schieffelin had no problem with their long-standing arrangements, as described above, since brandy was dutiable at a specific rate of duty, i. e., $1.25 per gallon.[5] Hence, no question of value was involved. In view of this circumstance, Hennessy and other brandy producers, such as Martell, who exported to the United States, invoiced and entered their brandy at the full f. o. b. list price without even bothering to show the distributor's discount.

However, late in 1963, a series of events known as the "Chicken War" intruded upon the brandy exporting trade, causing the producers to consider devising new methods of invoicing their exports to the United States in an attempt to legally reduce the value of their merchandise in the appraisement by United States customs officials.

The so-called "Chicken War" began when the European Economic Community (EEC) promulgated new higher fees on poultry imports into the Common Market. Among other things, these fees adversely affected the importation of frozen poultry from the United States into West Germany, a member of the EEC. In response to what were considered unduly burdensome foreign import restrictions on domestic poultry producers who exported to the Common Market countries, President Johnson issued Proclamation No. 3564 on December 4, 1963 (T.D. 56072), which withdrew previously proclaimed tariff concessions on EEC goods effective January 7, 1964.[6]

The higher rates resulting from withdrawing the concessions were calculated to increase the duty on EEC goods imported into the United States in an amount which would approximately balance the higher import fees imposed by the EEC.

So far as the present case is concerned, the Proclamation amended the tariff schedules by inserting the following item under the heading "Subpart B" of Part 2 of the Appendix thereto:

945.16   Brandy, valued over $9.00 per gallon (provided for in items 168.20 and 168.22)  . . . . .  $5 per gal.

The effect of the newly promulgated item 945.16 was to make the $5 per gallon duty on brandy applicable to a case

---

made additional payments to reimburse its distributor. In France, the home market, Hennessy conducted its own advertising without intermediaries.

5. Prior to 1964, the merchandise was classified under item 168.20 of the tariff schedules which provided for—
Brandy:
  In containers each holding not
    over 1 gallon  . .  .$1.25 per gal.

6. For a history of the Proclamation, see United States v. Star Industries, Inc., 462 F.2d 557, 59 CCPA 159, C.A.D. 1060 (1972), cert. den. 409 U.S. 1076, 93 S.Ct.

678, 34 L.Ed.2d 663 (1972), and sources cited therein. In *Star Industries*, the appellate court reversed the decision and judgment of the trial court, 65 Cust.Ct. 662, C.D. 4155, 320 F.Supp. 1018 (1970), which had declared the Proclamation invalid and void. Contrary to the trial court, the appellate court determined that the President did not exceed the authority granted to him under section 252(c) of the Trade Expansion Act of 1962 (19 U.S.C. § 1882(c)) in issuing Proclamation No. 3564 and thus held it to be valid.

of 24 tenths (2.4 gallons) valued over $21.60 a case, whereas the $1.25 duty on a case of 24 tenths valued at $21.60 or under (i. e., $9.00 or under per gallon) remained unchanged.

In this setting, in order to avoid the increased duties, Schieffelin and Hennessy worked out a new system to commence in January 1964 which in essence changed their method of invoicing from an f. o. b. list price to a so-called "net/net" price.

The "net/net" price reflected two deductions. One was the 7½ percent distributor's discount received by Schieffelin since 1934. This deduction brought the price down to $23.50 per case, which was the amount remitted to Hennessy in 1963 by Schieffelin under its old pricing arrangement.

The second deduction from the f. o. b. list price represented an "advertising allowance" for advertising placed in the United States by Schieffelin for Hennessy in connection with sales of the Bras Arme Cognac tenths. Under this new method, Hennessy and Schieffelin estimated Hennessy's advertising budget for 1964 which, based on Hennessy's advertising contribution" of $298,201.50 in 1963 for "advertising, point-of-sale merchandising and publicity", was approximately $300,000. This figure was then broken down into the amounts which Hennessy and Schieffelin estimated would be spent on advertising for the various marques and sizes. The parties then allocated $2.00 per case to the Bras Arme tenths and deducted that amount from the f. o. b. list price. This $2.00 per case allowance, in addition to the 7½ percent distributor discount, brought the invoice price down to $21.-495 per case—an amount which was under the $21.60 breaking point at which

the $5 per gallon customs duty went into effect.

As it turned out, however, the amounts originally estimated by Hennessy and Schieffelin to be spent on advertising had been calculated at a minimum figure, and the actual advertising expenditure by Schieffelin for each Hennessy product in 1964 was higher than the total amount of the deductions allowed off each shipment. In this connection, Schieffelin submitted a semi-annual report in June 1964 to Hennessy which detailed its receipts and actual disbursements and analyzed the advertising allowances for 1964 versus the actual "Hennessy advertising budget". It indicated that the actual expenses for 1964 would total just under $320,000. Hennessy thereupon remitted to Schieffelin a bank draft to cover the difference between the estimated advertising allowances and the actual expenses incurred.

It was against this background that the government appraiser (1) rejected Hennessy's invoiced "net/net" price of $21.495 for the shipments involved here, and (2) based the appraisements upon the f. o. b. list price of $25.40 per case for equivalent sizes of Martell Cognac brandy, less Martell's distributor's discount of 10 percent, and thus arrived at a value of $22.86 per case.[7]

At the trial below, both parties agreed that export value was the proper basis of appraisement. However, the government defended the value found by the appraiser, while the importer argued that the correct export value was the invoiced price of $21.495 per case.

The trial judge agreed with plaintiff that the imported merchandise should have been appraised on the basis of "such" Hennessy brandy, not the "simi-

---

7. Martell also incurred advertising expenses which, prior to 1964, it remitted periodically to its United States distributors by bank draft. Commencing January 1964, Martell also changed its bookkeeping procedures and remitted part of its share of advertising expenses by granting an "advertising allowance" which it de-

ducted on the invoice in order to bring the price of its brandy down to below the $9.00 per gallon limit. While the appraising officer allowed the distributor's discount in finding a value for the Hennessy brandy in question, he disallowed the claimed "advertising allowance".

lar" Martell brandy, in view of "the statutory priorities mandated" by section 402(f)(4) of the Tariff Act of 1930, as amended (19 U.S.C. § 1401a(f)(4)).[8] He stated (67 Cust.Ct. at 553):

> * * * The full f. o. b. Hennessy export price to the United States of $25.40 was stable during the entire 1963–64 period, and was comparable to the Hennessy prices in the home market and third country markets. Under these circumstances, there is no question in the court's mind but that the Hennessy price of $25.40 per case of 24 tenths of Bras Arme Cognac brandy fairly reflected the market value of the merchandise at bar, and all other conditions conducive to appraisement being present, this price should have been utilized in the appraisement of the instant merchandise.

In a further respect, however, the trial judge agreed with the principle applied by the appraiser in making a deduction against the full f. o. b. price to find a statutory export price. Accordingly, he found that the distributor's discount of 7½ percent paid by Hennessy to Schieffelin was "genuine" and an allowable deduction against the full f. o. b. price.

The trial judge also held that the advertising allowance of $2.00 per case was not an allowable expense, stating (67 Cust.Ct. at 554):

> * * * We are not concerned here with an accrued item of expense which influences the export price demanded and paid between foreign producer and American purchaser. The claimed item of expense is an expense connected solely with the *resale* of the imported product in the United States. In this posture the advertising expense has, to paraphrase the words of our appeals court, nothing to do with the price at which the involved merchandise was sold in France for exportation to the United States, although it did, to some extent affect the profits of the producer. * * *

The advertising expenditures directed at the United States market in this case are, in the court's opinion, the manifestation of a joint venture undertaken by the plaintiff-distributor and the foreign producer, who regarded plaintiff as its "agent", to promote the resale of the Hennessy products to their mutual advantage. And although the advertising allowance was taken into consideration under the net invoicing procedures initiated by Hennessy and plaintiff in 1964, this arrangement only subserved the convenience of the parties in "tracking" the advertising expenditures, the amount of which was as yet undetermined as of the time of preparation of invoices

---

8. Sec. 402(f)(4) of the Tariff Act of 1930, as amended, provides:

(4) The term "such or similar merchandise" means merchandise in the first of the following categories in respect of which export value, United States value, or constructed value, as the case may be, can be satisfactorily determined:

(A) The merchandise undergoing appraisement and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, the merchandise undergoing appraisement.

(B) Merchandise which is identical in physical characteristics with, and was produced by another person in the same country as, the merchandise undergoing appraisement.

(C) Merchandise (i) produced in the same country and by the same person as the merchandise undergoing appraisement, (ii) like the merchandise undergoing appraisement in component material or materials in the purposes for which used, and (iii) approximately equal in commercial value to the merchandise undergoing appraisement.

(D) Merchandise which satisfies all the requirements of subdivision (C) except that it was produced by another person.

covering export transactions. Therefore, as to this item, the court fully agrees with defendant when it states (defendant's brief, page 22):

> [T]he manufacturer and the plaintiff were engaged in a relationship distinct from sales and purchases of cases of Cognac. The relationship appeared to be that of agency, whereby the manufacturer procured about $300,000 worth of advertising for its product through the aid of its agent for this purpose, the plaintiff.

In conclusion, the trial court found the export value of the merchandise to be $25.40 per case, less a 7½ percent distributor's discount, packed.

On appeal, appellant has made the same claims as below. The government-appellee, however, has shifted from its original position and now concedes that "such" (i. e., Hennessy) merchandise should have been utilized as the basis for appraisement and that the claimed 7½ percent distributor's discount was allowable. The government also supports the "result" reached by the trial judge in disallowing the claimed deduction for the advertising allowance "although not on the same theory of law" (brief 21). It now argues that the allowance of $2.00 per case "was not a firm amount at the time of exportation" as it "was subject to later alteration" (brief 19). Accordingly, the government, relying on United States v. Josef Mfg., Ltd., 460 F.2d 1079, 59 CCPA 146 C.A.D. 1057, (1972), argues that since the advertising allowance was not fixed and determinate at the time of exportation, it may not be considered in determining the export value of the merchandise. In passing, it would seem that the government—inferentially at least—would agree with the converse of its the-sis, namely, that if the advertising allowance had been firmly pegged to a $2.-00 per case allocation that was fixed at the time of exportation, it would have been non-dutiable.

■ As to these several aspects, we are in accord with the trial judge that by virtue of the statutory priorities mandated by section 402(f)(4)(A), the imported merchandise should have been appraised on the basis of "such" or identical cognac brandy produced by Hennessy and not on the basis of "similar" brandy produced by Martell.

Since Schieffelin is a selected purchaser, the next question is whether the record establishes that the "price" of a case of 24 Bras Arme Cognac tenths fairly reflects market value as required by section 402(f)(1)(B) of the Tariff Act of 1930, as amended (19 U.S.C. § 1401a(f)(1)(B)).[9]

■ In determining whether a price fairly reflects market value, "in order to provide safeguards against the possible 'rigging' of export value through sales at non-market prices", comparison of home market and third country selling prices with the invoice to the selected purchaser here is an extremely important factor in determining whether the invoice price fairly reflects market value. Myerson Tooth Corporation v. United States, 61 Cust.Ct. 540, 544, R.D. 11597 (1968), aff'd 64 Cust.Ct. 860, A. R.D. 273, 313 F.Supp. 1016 (1970). See also e. g. United States v. Acme Steel Company, 51 CCPA 81, C.A.D. 841 (1964); C. H. Powell Co., Inc. v. United States, 69 Cust.Ct. 257, A.R.D. 307 (1972).

■ Certainly the full f. o. b. list export price (characterized by Hennessy's director as the "full f. o. b. world price"

---

9. Section 402(f)(1)(B) provides that—
  (f) For the purposes of this section—
    (1) The term "freely sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—
      *     *     *     *     *

(B) in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise, *  *  *.

(R.12)) of $25.40 per case of 24 tenths of Hennessy Bras Arme Cognac brandy was comparable to its prices in the balance of the dollar zone, as well as in the sterling zone and the home market. Thus, under the guidelines set out in the previous paragraph, it met the requirements of section 402(f)(1)(B) and was the appropriate price to use as a basis for the appraisements in question.

We also agree with the trial judge that the 7½ percent distributor's discount received by Schieffelin, in return for which it performed various services, is properly deductible from the f. o. b. list price. It was a bona fide discount which, it is to be noted, was also comparable to distributors' discounts given in third country markets and to Hennessy's own sales agents in France who received an 8 percent commission on sales to wholesalers.

The "advertising allowance", however, is of an entirely different nature. It is clear from the record that prior to 1964 Schieffelin placed advertising and laid out money for Hennessy (for which it was subsequently reimbursed) to promote the sale of Hennessy products in the United States.

What is of particular significance is that this relationship did not change in 1964. Schieffelin continued to place advertising for Hennessy, and Hennessy continued to pay for it as agreed upon in advance. However, instead of making reimbursements to Schieffelin on a lump sum basis, Hennessy paid for such advertising on a continuing basis by knocking $2.00 off the full f. o. b. list price. Thus, in essence, there was no change in the manner of doing business but simply a change in the invoicing procedure.

As previously indicated, the $2.00 deduction, which was based on "estimated amounts to be spent on advertising", was insufficient: Schieffelin subsequently submitted a semi-annual accounting to Hennessy of its disbursements and projected costs; and Hennessy made its final payments by bank drafts to meet those additional "mutually agreed upon, shared" expenses which were incurred as "opportunities [appeared] to us in the American market place" (R.41).

Thus, it is patent that the so-called "net/net" invoice price was not the *sales price*, but merely reflected a private billing arrangement in which Hennessy attempted to set off advertising expenses which it incurred against Schieffelin's payments for the merchandise. Undoubtedly, Hennessy could have made other arrangements for reimbursing Schieffelin for advertising expenses. It could, for example, have accomplished the same result by reducing the invoice price to $1.00 until all advertising expenses were paid off and then have billed Schieffelin for the full f. o. b. list price of $25.40 on all subsequent shipments for that year. The point is that there is no real distinction between the hypothetical $1.00 invoice price and the $21.495 invoice price here: both are arbitrary and both are irrelevant to the market price of the merchandise in question.

Another aspect to be considered is that expenses incurred on behalf of the seller and which inure to its benefit are costs incurred by the latter in producing its prices. Accordingly, the costs to a manufacturer in producing and marketing its product are part of the selling price and hence dutiable. Norco Sales Company v. United States, 65 Cust.Ct. 778, R.D. 11732, 319 F.Supp. 1399 (1970).

Furthermore, the place where the expenses were incurred or when they accrued is not controlling as long as they were considered a part of the price of the merchandise. In United States v. Erb & Gray Scientific, Inc., 54 Cust.Ct. 791, 795, 796, A.R.D. 186 (1965), aff'd 53 CCPA 46, C.A.D. 875 (1966), the Appellate Term stated (54 Cust.Ct. at 795–6):

It is reasonable to conclude that a seller of merchandise ordinarily computes all of his expenses before arriv-

ing at a price which he must receive for his merchandise, and it seems obvious that whether expenses are incurred in the country of exportation or in the country of importation, the price should cover them.

\*     \*     \*     \*     \*     \*

\* \* \* in the determination of export value, the emphasis is not upon when the issuable charges accrued, but upon what was the value in the principal market. If the disputed charges, whenever they may, in fact, accrue, are always included in the price at which the merchandise is sold, then they are part of that price and of the value which derives from that price. United States v. Paul A. Straub & Co., Inc., 41 CCPA 209, C.A.D. 553; Albert Mottola, etc. v. United States, 46 CCPA 17, C.A.D. 689.

 The short of the matter is that the advertising expenses in issue were part of Hennessy's general expenses incurred in connection with its export transactions. For the expenses incurred by a manufacturer for advertising his goods in a specific export market have a direct bearing on his sales for export to that market and thus are part of his expenses in producing such goods. As the Appellate Term stated in United States v. C. J. Tower & Sons, 52 Cust.Ct. 636, 637, A.R.D. 172 (1964):

> We are of the opinion that advertising costs paid for by the manufacturer whether in trade publications or in magazines directed toward the ultimate consumer, as is the case herein, should properly be included in the general expenses in determining costs of production under section 402(f), supra, since, in either event, the advertising inures to the benefit of the manufacturer. United States v. Alfred Dunhill of London, Inc., 32 CCPA 187, C.A.D. 305.

What is more, even if the $2.00 advertising allowance were a genuine "discount", as claimed, it still would not be deductible because the record establishes that this allowance was not fixed or determinate at the time of exportation, but

was only an estimate subject to later negotiation and revision. As the trial court aptly observed (67 Cust.Ct. at 554):

> \* \* \* this arrangement only subserved the convenience of the parties in "tracking" the advertising expenditures, the amount of which was as yet undetermined as of the time of preparation of invoices covering export transactions. \* \* \*

 In sum, the claimed invoice price here was not fixed at the time of exportation of the merchandise since it reflected an estimated advertising allowance which was to be renegotiated. And under the customs laws a fluctuating or negotiable price is no price for appraisement purposes. Statutory export value contemplates a fixed uniform price for the merchandise at the time of exportation. United States v. Josef Mfg., Ltd., 460 F.2d 1079, 59 CCPA 146, C.A.D. 1057 (1972); Aceto Chemical Co., Inc. v. United States, 51 CCPA 121, C.A.D. 846 (1964).

For the foregoing reasons, we affirm the decision and judgment of the trial judge and incorporate by reference his findings of fact and conclusions of law.