(C.D. 4700)

CARMICHAEL INTERNATIONAL SERVICE *v.* UNITED STATES

▬▬

</div>

144

Court Nos. R70/9113, etc.

(Decided June 9, 1977)

*Stein, Shostak, Shostak & O'Hara, Inc.* (*Marjorie M. Shostak* and *Theo B. Audett* of counsel) for the plaintiff.

*Barbara Allen Babcock*, Assistant Attorney General (*Velta A. Melnbrencis*, trial attorney), for the defendant.

MALETZ, Judge: These eight consolidated cases involve the proper dutiable values of certain wigs and other human hair pieces which were sold in Hong Kong for exportation to the United States by Croset & Company, Ltd. of Hong Kong. The merchandise covered by seven of the eight cases was exported from September 1964 through November 1965 and entered at the port of Los Angeles during the same period by Carmichael International Service (Carmichael) for the account of the M. Calig Company of Los Angeles. The merchandise covered by the eighth case was exported in November 1965 and entered at the port of Los Angeles in the same month by Carmichael for the account of the Hong Kong Trading Corporation of Los Angeles.

The imported merchandise was appraised by the government on the basis of export value as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, based on prices for *similar* merchandise. Plaintiff agrees that export value is the correct basis of the appraisement, but contends that the correct export values are represented by the actual prices paid to the manufacturer for *such* merchandise, as set forth in the invoices.

## THE STATUTE

Section 402 of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956 (19 U.S.C. 1401a) provides as follows:

### (b) Export value.

For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at

which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

\*　　·　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

## (f) Definitions.

For the purposes of this section—

(1) The term "freely sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—

    (A) to all purchasers at wholesale, or

    (B) in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise,

without restrictions as to the disposition or use of the merchandise by the purchaser, except restrictions as to such disposition or use which (i) are imposed or required by law, (ii) limit the price at which or the territory in which the merchandise may be resold, or (iii) do not substantially affect the value of the merchandise to usual purchasers at wholesale.

(2) The term "ordinary course of trade" means the conditions and practices which, for a reasonable time prior to the exportation of the merchandise undergoing appraisement, have been normal in the trade under consideration with respect to merchandise of the same class or kind as the merchandise undergoing appraisement.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(4) The term "such or similar merchandise" means merchandise in the first of the following categories in respect of which export value, United States value, or constructed value, as the case may be, can be satisfactorily determined:

    (A) The merchandise undergoing appraisement and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, the merchandise undergoing appraisement.

    (B) Merchandise which is identical in physical characteristics with, and was produced by another person in the same country as, the merchandise undergoing appraisement.

    (C) Merchandise (i) produced in the same country and by the same person as the merchandise undergoing appraisement, (ii) like the merchandise undergoing appraisement in component material or materials and in the purposes for which used, and (iii) approximately equal in commercial value to the merchandise undergoing appraisement.

    (D) Merchandise which satisfies all the requirements of subdivision (C) except that it was produced by another person.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

## The Issue

The question presented is whether plaintiff has proven by a preponderance of the evidence that its claimed values, i.e. the invoice prices, represent the proper dutiable values of the importations in question. This, in turn, depends on whether plaintiff has established that "such" merchandise, i.e. merchandise identical to the merchandise in question, was freely sold or, in the absence of sales, freely offered for sale, in the ordinary course of trade, for exportation to the United States at prices equal to the invoice prices. [1]

## The Record

The record consists of (1) an affidavit of Fanny Wan who identified herself as "bookkeeper and secretary" of the Croset company (plaintiff's exhibit 1); (2) the testimony of Milton Calig, president of the Calig company; (3) a letter dated July 9, 1965 from Mr. Calig to the customs appraiser of merchandise at Los Angeles (defendant's exhibit A); (4) a customs agent's report dated December 14, 1965 concerning wigs sold by the Croset company (defendant's exhibit B); and (5) the official papers in the eight cases. In addition, the record in *Majestic Electronics, Inc.* v. *United States*, 63 Cust. Ct. 628, R.D. 11686 (1969) was incorporated on motion by plaintiff and over objection by defendant on the ground that it was immaterial.

## Summary of Record

Given the circumstances present here, the action is best understood by summarizing the relevant portions of the record starting with plaintiff's exhibit 1, the affidavit executed by Fanny Wan on September 24, 1970 in Hong Kong. In her affidavit Miss Wan states that during the period January 1, 1964 to December 31, 1965 she was bookkeeper and secretary of the Croset company (Croset); that in that capacity she was fully and personally familiar with all sales and offers for sale made by Croset during that period, involving wigs and other human hair pieces, and with their selling prices; that she was fully familiar with sales of wigs [2] by Croset to the Calig company (Calig); and that all of the sales to Calig consisted entirely of items which were being closed out, or which had been overstocked.

Miss Wan further states in her affidavit that the prices of wigs sold by Croset to Calig varied from time to time, depending upon market

---

[1] It is undisputed that the principal market of the country of exportation was Hong Kong and that the prices did not vary with quantities sold.

[2] The term "wigs" as used here and hereafter refers to wigs and to other human hair pieces such as wiglets (which are small hair pieces combed into the hair to make it fuller and more stylish) and ponytails (which are placed on the back of the head to give the impression of long hair).

conditions, but that such wigs were at all times freely offered for sale, for exportation to the United States, to anyone wishing to purchase, at the same prices at which they were sold to Calig. Attached to the affidavit are copies of an invoice to Calig and an invoice to Hong Kong Trading Corporation of Hollywood, California, dated November 2 and November 8, 1965, respectively,[3] showing identical prices for various wigs, which the affidavit states truly reflect the prices at which the described merchandise was actually sold and "are representative of the uniform practice of Croset of freely offering and selling such merchandise at the same prices to anyone wishing to purchase."

Miss Wan's affidavit further states that no relationship, corporate, financial, or otherwise, existed between Croset and either Calig or Hong Kong Trading Corporation; that sales to both of those purchasers were in the usual course of business, without any restrictions as to disposition or use; and that it was the uniform practice of Croset, during the period January 1, 1964 to December 31, 1965, to offer and sell all wigs on an f.o.b. Hong Kong basis.

Bearing on the matters covered by Miss Wan's affidavit is Customs Form 5515, the Special Customs Invoice which is included in the official papers for all but two of the entries here involved.[4] This Special Customs Invoice shows "Croset & Company, Ltd." of Hong Kong as the seller. Section IV, column (4) of each such invoice shows the invoice unit price or value, while section IV, column (7) shows the "current unit price for export to United States." In each instance, the amount shown in column (4) and column (7) of section IV is the same. Further, question 4(B) of section V and the "x" answer on each Special Customs Invoice in these cases read as follows:

4. * * *
    (B) (1) Have you stated in section IV, column 7, the price at which you are now selling the goods or offering them for sale for export to the United States and whether this price is f.o.b., c.i.f., c. & f., or whatever the fact may be? ☒ Yes ☐ No
       (2) Is this price freely offered to anyone who wishes to buy the goods for export to the United States? ☐ Yes ☒ No.

Finally, each Special Customs Invoice contains a "PURCHASE DECLARATION" to the effect that all the information contained in the invoice is true and correct and each declaration bears the signature of Gaston O. Croset who is identified on the commercial invoices and packing lists as the managing director of Croset.

---

[3] The invoice to Calig, dated November 2, 1965, is identical to the invoice in Entry No. 105698, Court No. R70/9118. The other invoice to the Hong Kong Trading Corporation, dated November 8, 1965, is identical to the invoice in Entry No. 106090, Court No. R70/9120.

[4] All the official papers in these cases were received in evidence as an unmarked exhibit on motion of counsel for plaintiff.

We turn next to the testimony of Milton Calig who stated that he is the president of M. Calig Company; that during the years 1964 and 1965 he was an importer of human hair wigs, which his company purchased from the Croset company of Hong Kong; and that he commenced dealing with Croset when Mr. Gaston O. Croset visited him in Los Angeles and offered to sell him some wigs for importation into the United States from Hong Kong. In this connection, Mr. Calig's initial purchases were made around August of 1964 on the basis of samples and prices quoted by Mr. Croset in Los Angeles.

Mr. Calig further testified that in the latter part of 1964 he visited Mr. Croset in Hong Kong and purchased wigs; that he also purchased by cablegram, letter and phone; that he did not bargain with Mr. Croset as to the prices, but paid the quoted prices; and that the prices did not vary with the quantity of hair goods purchased.

The witness stated that in the latter part of 1964 when he was in Hong Kong, he was shown by Mr. Croset a price list on Croset's letterhead which set forth the prices of particular wigs according to color,[5] and he was charged the exact prices shown on the price list. He had no personal knowledge as to whether the price list was shown to anyone other than himself.

Mr. Calig further testified that when he visited Croset in Hong Kong, Mr. Croset offered him the wigs at a closeout price;[6] and that the offer included wigs already made, plus wigs Mr. Croset would have made by his contractor, to dispose of a stock of raw hair which he had purchased from the Van Yee Trading Company and which came from Mainland China.[7] Mr. Calig said that Mr. Croset was anxious to dispose of this stock of hair for a number of reasons: first, because he was afraid the hair from Mainland China would shortly be embargoed by the United States government, as it ultimately was; second, that the dyeing was of poor quality, the light colors being green and the blond having a greenish tint; and third, that new modacrylic fibers were soon to come in the market and that while he himself did not become aware of such wigs until the latter part of 1965, he assumed that Mr. Croset knew that as soon as modacrylic fibers became available for wigs, wigs made of human hair would no longer be in demand and that availability of modacrylic

---

[5] However, as shown by the official papers, the first time Calig was charged for wigs according to *color* commenced with the May 25, 1965 exportations. See Entry No. 113562 in Court No. R70/9117. Prior to that. Croset's sales to Calig were at a "flat" or single price per item regardless of color.

[6] The witness testified that he purchased the wigs from Croset for the next 15 months at closeout prices. It is to be noted, however, that in a letter to Customs dated July 9, 1965 (defendant's exhibit A) Mr. Calig stated that "on the majority of these shipments Croset Company, either sold us a product run at a 'close out' price, or they made a special run on a cheap light weight wig with unprocessed oriental hair for us." At trial, Mr. Calig denied that any of the wigs purchased by his company were specially made for his company.

[7] The record indicates that the wigs in question were fabricated for Croset by the Hong Kong Artificial Wig Manufactory.

fibers would have an effect on the price at which human hair pieces would be offered in Hong Kong in 1964 and 1965.[8]

Mr. Calig indicated that he had no personal knowledge as to how many customers Croset had in 1964 or 1965 nor how much such customers paid for the wigs they bought. He added, however, that he had seen actual invoices covering sales of identical wigs to other buyers at prices identical to the prices paid by him. On one occasion, he recalled that Mr. Croset showed him an invoice of another purchaser's order which contained identical prices to those he was paying. At this time Mr. Croset kept his hand over the other importer's name on the top, but Mr. Calig was able to determine it was the Hong Kong Trading Corporation "because as he was showing it to me his hand lifted off and I noticed Hong Kong Trading Company." Finally Mr. Calig made clear that at no time did he have access to the books and records of the Hong Kong Trading Corporation or of Croset.

Relevant, too, is a report concerning the Croset company, dated December 14, 1965, prepared in Hong Kong by Perry J. Spanos, acting senior customs representative, which is contained in the record as defendant's exhibit B. The report noted that Mr. Croset, the managing director of the Croset company, was interviewed and stated that until March of 1965 handmade wigs were sold to Calig for $11.00 each and machine-made wigs for $6.50 each. After March of 1965 there was a substantial change in price so that handmade wigs, depending on color, were invoiced to Calig from $15.95 to $17.95 each, while machine-made wigs were invoiced from $7.00 to $8.30 each. The report further commented that Mr. Croset indicated there were no business documents pertaining to the instant transactions claiming that (1) the letters and order numbers mentioned on the commercial invoices were imaginary; (2) there were no records kept or invoices issued by the Hong Kong Artificial Wig Manufactory (which, as previously mentioned, manufactured the hair goods for Croset from hair supplied by that firm); and (3) in general, there were no documents available to substantiate the unit values. The report added that Mr. Croset did offer copies of "Cost Calculations" which, it was indicated, could not be substantiated by any business records.

According to the report, the invoiced prices to Calig were extremely low in comparison with substantial quantities of similar wigs exported during 1964–1965 by various other Hong Kong manufacturers to several U.S. importers, in large wholesale quantities, which were at the following *minimum* prices per unit:

1. Hand-made wigs: US$20.00 to US$35.00 depending on color.

---

[8] In general, according to Mr. Calig, three factors determined the price of a wig: (1) whether it was hand-made or machine-made; (2) the weight of the particular hair piece; and (3) the quality of the dye.

2. Machine-made wigs: US$11.50 to US$14.50 depending on color.

The report of the customs representative further noted that the Hong Kong Artificial Wig Manufactory, which fabricated the wigs in question, had been liquidated and that no records were available for examination. However, the report stated that according to the recollection of Chiu Wai Mau, who had been assistant manager of that company, (1) Croset supplied the hair to his firm already bleached and dyed as well as the netting; and (2) all wigs for Croset were manufactured according to specifications and a prearranged color scheme combination and there never were any "seconds" or "discontinued styles" or "close-out" merchandise involved.

## OPINION

As previously mentioned, the imported merchandise was appraised by the government on the basis of export value based on prices for *similar* merchandise. However, under the language of section 402(f)(4), *supra*, consideration must be given to the statutory value of *"such"* merchandise, i.e. identical merchandise produced by the same manufacturer,[9] before consideration can be given to the statutory value of *"similar"* merchandise. See, e.g., *Schieffelin & Co.* v. *United States*, 71 Cust. Ct. 209, 214–15, A.R.D. 317, 360 F. Supp. 1386, 1390–91 (1973), *aff'd* 62 CCPA 7, C.A.D. 1135, 504 F. 2d 1147 (1974); Sturm, *A Manual of Customs Law* at 54–55 (1974). Thus, plaintiff had the burden of proving that merchandise made by the same producer which was identical to the merchandise in question was freely sold or, in the absence of sales, freely offered for sale, in the ordinary course of trade, for exportation to the United States at prices equal to the invoice prices. Should plaintiff meet this burden it would not have to disprove the correctness of export value for "similar" merchandise since under the statutory priorities mandated by section 402(f)(4) the latter would not apply.

In this setting, we consider first whether plaintiff has proven that "such" merchandise was freely sold to all purchasers for exportation to the United States at prices equal to the invoice prices. On this aspect, there is no competent evidence to establish that the imported wigs were freely *sold* to all purchasers at the invoice unit values. For one thing, Mr. Calig was not competent to testify as to the prices at which *Croset* freely sold his merchandise. The fact that Mr. Calig may have seen a few purported invoices which charged the same prices charged to Calig for identical merchandise cannot establish that the same prices were charged to all. At most, Mr. Calig's testimony shows

---

[9] Plaintiff has not contended that an export value exists for merchandise identical to the imported merchandise but manufactured by a different manufacturer.

that some U.S. purchasers other than Calig were charged the same prices. What is more, Mr. Calig was able to see (and then only furtively) only one of the purported purchasers' names, i.e. that of the Hong Kong Trading Corporation. And with specific respect to the Hong Kong Trading Corporation, it is hardly determinative that some of the merchandise was invoiced to that company at the same prices as to Calig.[10]

Further, Fanny Wan's unsupported statement that the copies of the invoices to Calig and to Hong Kong Trading Corporation, showing identical prices for various wigs, reflect the prices at which the merchandise was actually sold and "are representative of the uniform practice of Croset of freely offering and selling such merchandise at the same prices to anyone wishing to purchase" certainly cannot be considered as probative evidence that "such" merchandise was freely sold to *all* purchasers for exportation to the United States at the same price.[11] Indeed, there is no evidence that anyone else "wished" to buy at the prices charged to Calig.

Beyond this, plaintiff contends that Fanny Wan's affidavit and Mr. Calig's testimony establish that the imported merchandise was freely offered for sale to all purchasers for exportation to the United States at prices equal to the invoice prices. For the reasons that follow, the court cannot agree with this argument.

In the first place, Gaston O. Croset, the managing director of the Croset company, quoted the prices for the merchandise to Calig and personally signed all the invoices and packing lists in these consolidated actions. Thus, as the managing director of the seller he was clearly the person most competent and qualified to testify regarding Croset's sales practices, sales prices, and offers for sale. Yet, Mr. Croset was never called to testify, nor was his affidavit offered into evidence. These facts support an inference that Mr. Croset's testimony would have been unfavorable to plaintiff. See, e.g., McCormick, *Handbook of the Law of Evidence* § 249, at 533–34 (1954).

Secondly, as previously observed, on the Special Customs Invoices, moved into evidence by plaintiff along with the other official papers, in reply to question 4(B)(2) Mr. Croset specifically indicated that the

---

[10] As seen from the official papers, Hong Kong Trading Corporation did not pay $11.00 or $6.50 per wig, or $1.50 or $2.50 per hair piece or wiglet which were the prices charged to Calig through March 8, 1965. Nor did the Hong Kong Trading Corporation pay $7.00, $7.55, $8.30, $9.20, $15.95, $16.80 or $17.95 per wig. Yet these were some of the prices charged to Calig commencing with the May 25, 1965 exportation. Moreover, there is no proof that the Hong Kong Trading Corporation ever imported any hair goods other than those covered by Entry No. 106090 in Court No. R70/9120. Since this merchandise was sold for exportation subsequent to Calig's merchandise, its price cannot be used to determine the export value for Calig's merchandise. See *Spanexico, Inc.* v. *United States*, 75 Cust. Ct. 123, C.D. 4616, 405 F. Supp. 1078 (1975), *aff'd* 64 CCPA 6. C.A.D. 1176, 542 F. 2d 568 (1976): *B & W Wholesale Co., Inc.* v. *United States*, 63 Cust. Ct. 691, 697–98, A.R.D. 262 (1969), *aff'd* 58 CCPA 92, C.A.D. 1010, 436 F. 2d 1399 (1971).

[11] Miss Wan's affidavit and the weight to be given to it are discussed in some detail in a later part of this opinion.

invoice unit prices *were not* freely offered to anyone who wished to buy the foods for export to the United States. At no time did the plaintiff attempt to explain away this statement by Mr. Croset. Instead, plaintiff's rebuttal on this point lies in the uncorroborated statement in Fanny Wan's affidavit to the effect that the wigs in question were at all times freely offered for sale for exportation to the United States, to anyone wishing to purchase, at the same prices at which they were sold to Calig.

Miss Wan's assertions about transactions which took place five years earlier are unsupported by any reference to books of account, price lists, letters, or other documents except for the two invoices attached to the affidavit. Thus, her affidavit suffers from the same deficiencies as the affidavit in *Andy Mohan, Inc.* v. *United States*, 74 Cust. Ct. 105, 114, C.D. 4593, 396 F. Supp. 1280, 1287–88 (1975), *aff'd* 63 CCPA 104, 107, C.A.D. 1173, 537 F. 2d 516, 518 (1976), and is entitled to little weight. In fact, she even fails to allege that at the time of executing the affidavit she was in possession of any of Croset's books, records, or other documents (except for the two invoices) which enabled her to reach the conclusions set forth in her affidavit. As the appellate court stated in *Andy Mohan, supra,* 63 CCPA at 107, 537 F. 2d at 518:

> Evidence should be assessed "in practical terms, considering such factors as completeness, adequacy of bases, and possible motives to deceive," rather than on the basis of artificial distinctions between ultimate and evidentiary facts. *Mannesmann-Meer, Inc.* v. *United States,* * * * [58 CCPA 6, C.A.D. 995, 433 F. 2d 829 (1970)].

Against this background, it is apparent that Miss Wan's affidavit is incomplete, inadequately based, insufficiently supported by records, and in flat contradiction to Mr. Croset's declarations in the Special Customs Invoices.

Finally, Mr. Calig testified that Mr. Croset showed him a price list in the latter part of 1964, which price list set forth the prices of particular wigs according to color and that the prices charged to Calig were the prices set forth in the price list. However, Miss Wan makes no mention of such a price list; Mr. Calig had no knowledge that the price list was ever shown to anyone other than himself; and Croset clearly did not follow such a price list in the latter part of 1964 or first part of 1965 because Calig was not charged prices depending on color until the May 25, 1965 exportations. But even if such a price list existed, there is no showing as to the time when it was in effect or that any offers were ever based on it, much less that all offers were based on it.

In sum, it is clear that the record fails to establish that "such" merchandise was freely sold or offered for sale to all purchasers for

exportation to the United States at the same prices, i.e. the invoice unit prices. It is thus evident that plaintiff has failed to prove that its claimed values, i.e. the invoice prices, represent the proper dutiable values of the importations in question.[12] Therefore the appraised values are affirmed and judgment will be entered accordingly.

(C.D. 4701)

---

[12] In view of this conclusion, it is unnecessary to reach the question as to whether the sales in issue were in the ordinary course of trade.