751 F.2d 1239
 6 ITRD 1593, 3 Fed. Cir. (T) 58
 AMERICAN ASSOCIATION OF EXPORTERS AND IMPORTERS-TEXTILE AND
APPAREL GROUP, Appellant,
and
Hilaturas Lerma, S.A., Intervenor,
v.
The UNITED STATES, et al., Appellees,
and
American Fiber/Textile Apparel Coalition, Intervenor.
 Appeal No. 84-1060.
 United States Court of Appeals,
Federal Circuit.
 Jan. 4, 1985.
 
 Martin J. Lewin, Daniels, Houlihan & Palmeter, P.C., Washington, D.C., argued for appellant. With him on the brief was Michael P. Daniels, Washington, D.C.
 David M. Cohen, Dept. of Justice, Washington, D.C., argued for appellees. With him on the brief were Richard K. Willard, Acting Asst. Atty. Gen., Washington, D.C., and Velta A. Melnbrencis, New York City.
 Donald Harrison, Miller & Chevalier, Washington, D.C., argued for intervenor AFTAC. With him on the brief was Kenneth B. Reisenfeld, Washington, D.C.
 Stuart M. Rosen, Washington, D.C., and Jeffrey P. Bialos, Weil, Gotshal & Manges, New York City and Washington, D.C., were on the brief, for amicus curiae.
 Before DAVIS, BENNETT and NEWMAN, Circuit Judges.
 DAVIS, Circuit Judge.
 
 
 1
 This is an appeal by the American Association of Exporters and Importers-Textile and Apparel Group (AAEI-TAG),[1] from a judgment of the United States Court of International Trade (CIT), Gregory W. Carman, Judge, granting the Government's motion to dismiss the complaint for failure to state a claim on which relief can be granted.[2] AAEI-TAG seeks, inter alia, a declaratory judgment that actions taken by the Government pursuant to certain international agreements regulating trade in textile products are void for alleged statutory, administrative and constitutional defects. The Government presses its argument, rejected by Judge Carman, that the CIT lacked jurisdiction over AAEI-TAG's claim.[3] We affirm the decision of the court below as to jurisdiction and standing, as well as the merits.I
 
 BACKGROUND
 
 2
 A. The Regulatory Scheme.
 
 
 3
 At the root of the scheme by which the United States regulates international trade in textiles is section 204 of the Agriculture Act of 1956, as amended, 70 Stat. 188, 200, codified at 7 U.S.C. Sec. 1854 (1982). In relevant portion, that statute states:
 
 
 4
 The President may, whenever he determines such action appropriate, negotiate with representatives of foreign governments in an effort to obtain agreements limiting the export from such countries and the importation into the United States of any agricultural commodity or product manufactured therefrom or textiles or textile products, and the President is authorized to issue regulations governing the entry or withdrawal from warehouse of any such commodity, product, textiles, or textile products to carry out such agreements.
 
 
 5
 Section 204 also authorizes the President to issue regulations governing trade in textiles with nations not covered by any agreement, so as to protect the textile trade program which the agreements establish.
 
 
 6
 The stem of the Government's system for regulating the textile trade is the Arrangement Regarding International Trade in Textiles (commonly, the "Multifiber Arrangement" or "MFA"), December 20, 1973, 25 U.S.T. 1001, T.I.A.S. No. 7840. The purpose of the MFA, as announced in its Preamble, is to negate "the tendency for an unsatisfactory situation to exist in world trade in textile products ... to the detriment of countries participating in trade in textile products, whether as importers or exporters, or both." Specifically, the MFA includes provisions for "special practical co-operation ... with the aim of eliminating difficulties that exist in this field." Id., art. 1 p 1. There are provisions for gradual elimination of restrictions in the textile trade. Id., art. 2. Parties to the MFA may impose quotas, however, in conjunction with a request for consultations with other parties, upon a determination that imports "are causing market disruption as defined in Annex A." Id., art. 3, p 2.
 
 
 7
 Annex A, thus referred to in article 3, declares that a determination that the potential for market disruption exists should "be based on the existence of serious damage to domestic producers or actual threat thereof." The Annex lists certain factors which bear on a determination of market disruption, and requires that these factors be considered.[4] Following a determination of market disruption and a call for consultations, the parties may agree on measures to rectify the market disruption; but, if they cannot agree, the importing country may take certain unilateral protective actions. Id., art. 3, p 5. This procedure is subject to review by the Textile Surveillance Body, an international organization created within the framework of the General Agreement on Tariffs and Trade (GATT). Id. art. 3, p 5(iii); art. 10, p 1.
 
 
 8
 The MFA, in an effort to "eliminate real risks of market disruption (as defined in Annex A)," also encourages parties to enter into bilateral textile trade agreements the terms of which should be consistent with the MFA. Id., art. 4, p 2. Under this provision, the United States has entered into bilateral agreements with other parties to the MFA and with nonparties. Typical of the latter, and of special concern in the present case, is the Agreement Relating to Cotton, Wool and Manmade Fiber Textiles and Textile Products, Sept. 17, 1980, between the United States and the People's Republic of China (P.R.C.), 32 U.S.T. 2071, T.I.A.S. No. 9820. This agreement with the P.R.C. sets forth quantitative limits on exports of different categories of textiles and textile products to the United States; categories not specifically covered fall within a residuary provision. In particular, the agreement establishes a consultation mechanism tied to the market disruption standard of the MFA.
 
 
 9
 In the United States, the President has delegated all of his authority under section 204 to administrative agencies, the most important of which (for the purposes of this case) is the Committee for the Implementation of Textile Agreements (CITA). See, Exec. Order No. 11,651, 37 Fed.Reg. 4699 (1972), as amended, reprinted following 7 U.S.C.A. Sec. 1854 (1984 Supp.). CITA has the authority under section 204 to (1) negotiate bilateral agreements, (2) to carry through the consultation mechanism described above, (3) to implement all resulting agreements, and (4) to order unilateral imposition of quotas in accordance with the provisions of the MFA and bilateral arrangements. AAEI-TAG challenges CITA's actions with regard to the second and fourth of these functions.[5]
 
 
 10
 B. AAEI-TAG's Complaint.
 
 
 11
 The gist of AAEI-TAG's complaint is that CITA has requested consultations and unilaterally instituted quotas without a proper finding of "market disruption," as required by the MFA and the bilateral agreements.[6] AAEI-TAG claims that CITA has improperly requested consultations or undertaken unilateral actions on 75 occasions between 1980 and 1982.[7] Of particular concern to AAEI-TAG, as evidenced by the detailed treatment in its complaint, is the unilateral imposition of quotas on Chinese textile imports lower than those established by the U.S.-P.R.C. agreement. AAEI-TAG alleges that CITA's actions have irreparably harmed its members through additional costs, delays, embargoes, and disruption of orders subject to irrevocable letters of credit. CITA's actions are challenged on several grounds, the most important of which are that CITA: (1) acted arbitrarily and capriciously; (2) exceeded the scope of its statutory authority under section 204; and (3) violated the rulemaking provisions of the Administrative Procedure Act, 5 U.S.C. Sec. 553 (1982). AAEI-TAG also includes a constitutional due process argument.
 
 
 12
 In support of its first argument, AAEI-TAG points to a Department of Commerce solicitation which sought assistance in collecting data on the United States apparel market.[8] The solicitation states:
 
 
 13
 There is a critical need for such data. At present, there is a lack of sufficient and timely apparel production, sales, consumption, and price data. This information is necessary to identify and substantiate market disruption....
 
 
 14
 Presently, OTEXA [the Commerce Department office responsible for providing CITA with administrative support] uses current import data and production data that range from 12 to 24 months old.
 
 
 15
 AAEI-TAG points to this "admission" by the Government, and asserts that CITA's actions are not based on a proper determination of market disruption as required by the MFA and bilateral agreements. The resulting requests for consultation and unilateral imposition of import restrictions are, according to AAEI-TAG, arbitrary and capricious.
 
 
 16
 AAEI-TAG bases its argument as to statutory authority on its interpretation of section 204 which views that provision as having granted the President two separate powers. The first authorizes the President (through CITA) to negotiate with foreign governments in an effort to obtain agreements limiting textile imports into the United States. AAEI-TAG concedes that the President has full discretion in this area, since Congress called for such negotiations "whenever he [the President] deems appropriate." The second authorization in section 204 allows the President to issue regulations governing textile trade "to carry out any such agreement." The argument runs that Congress, by using the phrase "to carry out," intended to authorize only such regulations which properly implement the very agreements the President has negotiated. In a corollary argument, AAEI-TAG contends that Congress intended to incorporate the terms of the agreements into the statute, and that, by violating the strict terms of the agreement, CITA exceeded its statutory authority.
 
 
 17
 With regard to the procedure CITA employs, AAEI-TAG claims that CITA's requests for consultations and the unilateral impositions of quotas are administrative actions subject to the notice and comment provisions of the APA. Moreover, according to AAEI-TAG, denial of an opportunity to be heard prior to imposition of quotas violates the importers' due process rights.
 
 
 18
 C. Opinion of the Court of International Trade.
 
 
 19
 Judge Carman first rejected the Government's objections to the CIT's jurisdiction. That objection centers on whether AAEI-TAG's claim was brought before the CIT under 28 U.S.C. Sec. 1581(a), which requires exhaustion of administrative remedies in the Customs Service prior to an action in the CIT, or 28 U.S.C. Sec. 1581(i), which does not.[9] Judge Carman noted that "a denied protest [by the Customs Service] is not an absolute precondition to the Court of International Trade's exercise of subject matter jurisdiction." To distinguish between those instances in which a protest is necessary and when it is not, the court looked to our predecessor court's opinion in United States Cane Sugar Refiners' Association v. Block, 683 F.2d 399, 402 n. 5 (CCPA 1982), in which the CCPA stated that the CIT has jurisdiction under Sec. 1581(i), prior to the exhaustion of administrative remedies, in cases "involving the potential for immediate injury and irreparable harm to an industry and a substantial impact on the national economy." Judge Carman distinguished another case, Uniroyal, Inc. v. United States, 687 F.2d 467, 471 (CCPA 1982), as having involved merchandise already brought into the United States; in that situation, the court ruled that the importer was required to exhaust all avenues of protest with the Customs Service and appeal under Sec. 1581(a).
 
 
 20
 On the merits of AAEI-TAG's claim, the CIT ruled that "the court must, at a minimum scrutinize the statute and the actions taken under it to determine if the scope of the delegation [from Congress to the President] was exceeded." The court then held that section 204 conveyed to the President an extraordinarily broad (though constitutionally sound) measure of discretion, and that CITA's actions, if rationally related to the statutory purpose, must be upheld. CITA's challenged actions were decided to be within that delegated authority. Moreover, the CIT determined that "To the extent ... that plaintiff contests CITA's findings of market disruption and inquiries into its reasoning, such claims are beyond judicial scrutiny."
 
 II
 JURISDICTION
 
 21
 The Government strongly pursues its contention that the CIT lacked jurisdiction over this case. That issue translates into the question whether a party challenging an import restriction imposed by CITA must attempt to import a textile product, have the Customs Service deny entry, protest the decision within Customs, and then, following denial of the protest, bring an action in the CIT under Sec. 1581(a), supra; or whether a prospective importer (prior to attempting an import) may challenge CITA's actions in the CIT under Sec. 1581(i), supra.
 
 
 22
 Section 1581(i) provides in terms that the CIT "shall have exclusive jurisdiction over any civil action ... that arises out of any law of the United States providing for--... (3) embargoes or other quantitative restrictions ... or (4) administration and enforcement with respect to matters referred to in [paragraph 3]." (Emphasis added.) On the face of the statute, AAEI-TAG's claim fits squarely. Section 204 is a law providing for quantitative restrictions on textiles. AAEI-TAG objects to CITA's administration and enforcement of the quotas established under the authority of section 204, as described in Part I B., supra. Even if one chooses a restrictive interpretation of the broad terms Congress employed in paragraphs 3 and 4 of Sec. 1581(i), this case meets the literal language of that additional jurisdictional provision.
 
 
 23
 The legislative history confirms this conclusion. Prior to promulgation of the present version of Sec. 1581 in the Customs Court Act of 1980, Pub.L. No. 96-417, 94 Stat. 1728, the jurisdiction of the Customs Court (now the CIT) was limited to the review of the Customs Service's denial of protests concerning the exclusion, classification, or valuation of imported merchandise. The Customs Court's jurisdiction was "exclusive"; in fact, the statute providing for federal question jurisdiction over importation matters in the district courts specifically denied the district courts concurrent jurisdiction with the Customs Court over international trade matters.[10] This seemingly simple division of jurisdiction soon created a problem: since the Customs Court had jurisdiction only after Customs' denial of a protest, and since the federal question statute denied the district courts jurisdiction only over those matters in which the Customs Service had jurisdiction, could a prospective importer challenge in district court a Customs Service regulation prior to actual importation (and, therefore, prior to a protest)?
 
 
 24
 The cases on this issue in the courts of appeals were not uniform.[11] In Sneaker Circus, Inc. v. Carter, 566 F.2d 396 (2d Cir.1977), the Second Circuit ruled that the district court had jurisdiction over a case in which a prospective importer challenged Customs Service regulations promulgated pursuant to international agreements. The court reasoned that these agreements would be enforced abroad, restricting the opportunity for an importer to attempt to bring in merchandise beyond the agreements' terms. Since in that situation the Customs Service would never have the opportunity to consider a protest, the Customs Court could never obtain jurisdiction, and the district courts had jurisdiction under the federal question statute. 566 F.2d at 399.
 
 
 25
 The District of Columbia Circuit reached an opposite result in Consumers Union of the United States, Inc. v. Committee for the Implementation of Textile Agreements, 561 F.2d 872 (1977) (per curiam ), cert. denied, 435 U.S. 933, 98 S.Ct. 1509, 55 L.Ed.2d 531 (1978). Consumers Union challenged CITA's import restrictions prior to any attempt to import merchandise beyond CITA's ceilings. That court of appeals ruled that the district court lacked jurisdiction: "Here ... if anyone wishes to challenge the Committee's actions, he can do so as other challenges of that nature are made, i.e., as an importer ... bringing textiles into the United States." 561 F.2d at 874. Contrary to the Second Circuit's opinion, the court ruled that judicial review of CITA's actions could be had only in the Customs Court following the denial of a protest by the Customs Service.
 
 
 26
 In the Customs Court Act, Congress specifically sought to resolve the confusion between the district courts' and the then Customs Court's jurisdictions. S.Rep. No. 466, 96th Cong., 1st Sess. 4-5; H.Rep. No. 1235, 96th Cong., 2d Sess. 29-30 (1980), reprinted in 1980 U.S.Code Cong. & Admin.News 3729, 3741. The Senate Report clearly states the intended effect of the new statute, and its reasons:
 
 
 27
 Because the statutes defining the jurisdiction of the Customs Court are so intricate and because international trade problems have become so complex, it has become increasingly more difficult to determine, in advance, whether or not a particular case falls within the exclusive jurisdiction of the Customs Court and is therefore excluded from the jurisdiction of the district courts. The result has been demonstrated by the fact that a significant number of civil actions have been initiated in the district courts only to be dismissed for lack of jurisdiction. See, for example, ... Consumers Union of United States, Inc. v. Committee for the Implementation of Textile Agreements, [supra ]....
 
 
 28
 ... The amended bill attempts to solve this problem by clarifying the existing jurisdictional statutes relating to the United States Customs Court and by expanding the jurisdiction of the Court to include any civil actions involving imports and a statute, constitutional provision, treaty, executive agreement or executive order which is directly and substantially concerned with international trade.
 
 
 29
 S.Rep. No. 466, supra, at 4-5 (emphasis added). The House Report, though not so direct, is to the same effect: "The dismissal of these actions after great expenditures of time and resources, has produced frustration on the part of litigants and the courts. H.R. 7540 will resolve this problem by defining the demarcation between the Court of International Trade and the federal district courts...." H.Rep. No. 1235, supra, at 30, U.S.Code Cong. & Admin.News 1980, p. 3741.
 
 
 30
 The main thrust of the Senate Report seems to us to be that Congress intended to put aside the Consumers Union rationale and to expand the jurisdiction of the CIT. The objective of the addition of Sec. 1581(i) was to make it clear that the CIT was to be the forum, and that prospective importers challenging Customs Service regulations imposing import restrictions need not attempt to import merchandise, file a protest and then contest the administrative denial of the protest in the CIT under Sec. 1581(a). See, Sneakers Circus, supra. The decision to clarify and expand the jurisdiction of the CIT--rather than to clarify the jurisdiction of the district courts--as a means for resolving the jurisdictional problem indicates that Congress intended plaintiffs in appellants' shoes to bring their cases in the CIT rather than in the district court.
 
 
 31
 Similarly, the House Report stresses the legislative purpose of clarifying the boundary between the CIT's and district courts' jurisdiction. If those challenging import restrictions must exhaust their remedies with the Customs Service, as the Government urges here, CIT jurisdiction will then arise under Sec. 1581(a). Little scope, if any, would remain for Sec. 1581(i). If anything were left of that new provision, it would be exceedingly narrow and of indeterminate and inconclusive impact. This result is plainly contrary to Congress' purpose in enacting Sec. 1581(i)--to establish clear rules and to center international trade litigation in the CIT. We refuse to create a jurisdictional morass when Congress exerted its efforts to remove one.
 
 
 32
 The decisions relied upon below support this conclusion. In U.S. Cane Sugar, supra, the plaintiff objected to quotas on sugar imports. The Court of Customs and Patent Appeals noted that, absent Sec. 1581(i), the case would have gone to the district courts; the court concluded that jurisdiction under Sec. 1581(i) was appropriate and found relief under Sec. 1581(a) to be "manifestly inadequate." 683 F.2d at 402 n. 5. In Uniroyal, supra, on the other hand, the importer had already entered the goods in this country, and the goods were subject to redelivery (a situation quite different from the plight of a prospective importer who faces quantitative import restrictions). The court there held only that Sec. 1581(i) could not be used where Sec. 1581(a) was already completely available. The present case falls squarely within the U.S. Cane Sugar rule, and the CIT properly considered the substance of AAEI-TAG's claim.[12]
 
 III
 STANDING
 
 33
 The Government also disputes here, as it did in the CIT, AAEI-TAG's standing to bring this suit. As Judge Carman correctly held, 28 U.S.C. Sec. 2631(i) declares that an action under Sec. 1581(i) "may be commenced in the [CIT] by any person adversely affected by agency action within the meaning of section 702 of Title 5"; and AAEI-TAG represents persons having a direct interest in purchasing the textile and apparel products now involved (and with contractual relationships based thereon), who will be injured by the quantitative restraint under attack. That is sufficient under the law. Cf. Florsheim Shoe Company v. United States, 744 F.2d 787, 790-92 (Fed.Cir.1984).
 
 IV
 MERITS
 
 34
 AAEI-TAG's arguments on the merits divide into three separate areas of inquiry, and we shape our discussion accordingly. AAEI-TAG first claims that CITA failed to abide by its statutory authority when it requested consultations or imposed unilateral quotas on textile imports. Second, it is charged that CITA acted arbitrarily in that it failed to lay the proper factual foundation for a determination of market disruption as required by the MFA and the bilateral agreements. The third objection to CITA's actions is that the agency violated AAEI-TAG's members' statutory and constitutional rights to have notice of the proposed actions and an opportunity to be heard.
 
 
 35
 * The core of AAEI-TAG's first argument is that CITA's imposition of import restrictions must, under section 204, be carefully crafted "to carry out"--in the sense of "executing"--the international agreements into which the United States has entered. AAEI-TAG insists that the phrase "to carry out" means "to implement" or "to put into execution." The conclusion follows, according to AAEI-TAG, that CITA must follow explicitly the terms of the international agreements; otherwise, CITA has failed "to carry out" the agreements, and CITA's actions are beyond the scope of its congressionally delegated authority. By using the phrase "to carry out," AAEI-TAG specifically asserts, Congress intended to incorporate the terms of any agreements concluded pursuant to section 204 into that statute itself.[13]
 
 
 36
 We are not persuaded, however, that the statutory phrase "to carry out" has the narrow meaning which AAEI-TAG ascribes to it. That Congress authorized the President to implement the textile trade agreements by regulation does not imply that Congress restricted the President's discretion in this regard by requiring him to implement the agreements in the particular manner seen by appellant. On the contrary, the beginning of Section 204 says that the President "may, whenever he determines such action appropriate"--and that preamble covers, not only negotiation with foreign representatives, but also the issuance of regulations "to carry out" the negotiated agreements. That is a broad grant of authority to the President in the international field in which congressional delegations are normally given a broad construction. South Puerto Rico Sugar Co. Trading Corp. v. United States, 167 Ct.Cl. 236, 334 F.2d 622, 632 (Ct.Cl.1964). Of course, the President's regulations must pertain to the general subject of the agreements, or else the President (absent another statutory authorization) has invaded a field granted by the Constitution to Congress. The statute itself, however, imposes no restrictions on the President's administration of the textile trade program. There are no procedural requirements nor limitations. We find no basis, either within section 204 itself, the overall statutory scheme, or the legislative history, to add more to the statute than meets the eye. All that is needed is that the President's action be relevant to the enforcement of some existing textile agreement.
 
 
 37
 AAEI-TAG argues that, in a situation comparable to this, courts have viewed international agreements as incorporated into a statute, and have construed them together. The cases AAEI-TAG cites are clearly inapposite. For example, in United States v. Star Industries, Inc., 462 F.2d 557, 59 CCPA 159 cert. denied, 409 U.S. 1076, 93 S.Ct. 678, 34 L.Ed.2d 663 (1972), the court upheld a presidential proclamation revising the Tariff Schedules of the United States, issued pursuant to the Trade Expansion Act of 1962. The court considered the effect of the GATT on the President's authority; it did so, however, because the statute required the President to maintain "due regard for the international obligations of the United States." 19 U.S.C. Sec. 1882(c) (1982). The court concluded that, under the terms of the proclamation, "the legislative intent to take strong measures against those who maintain unreasonable import restrictions was upheld, and at the same time we did not breach our international obligations." 462 F.2d at 564. In another case AAEI-TAG cites, China Liquor Distribution Co. v. United States, 343 F.2d 1005, 52 CCPA 1 (1964), the relevant statute explicitly stated that nothing therein should apply if inconsistent with the United States' treaty obligations. The present statute, which involves no provision confining its scope to the terms of an international arrangement, differs sharply from these other laws.
 
 
 38
 We accentuate, again, that legislation conferring upon the President discretion to regulate foreign commerce invokes, and is reinforced and augmented by, the President's constitutional power to oversee the political side of foreign affairs. "In the intercourse of nations, changes in economic relationships have many an important political corollary." South Puerto Rico Sugar Co. Trading Corp. v. United States, supra, 334 F.2d at 630. In the area of international trade, "intimately involved in foreign affairs," "congressional authorizations of presidential power should be given a broad construction and not 'hemmed in' or 'cabined, cribbed, confined' by anxious judicial blinders." Florsheim Shoe Co. v. United States, 744 F.2d 787, 793 (Fed.Cir.1984), quoting South Puerto Rico Sugar, supra, 334 F.2d at 632.
 
 B
 
 39
 AAEI-TAG contends that CITA's regulations, even if authorized, are not based on a sufficient factual foundation, and are, therefore, arbitrary and capricious. We are pointed toward the Commerce Department's solicitation requesting better information on textile trade, and are told that the Government has thereby conceded that it cannot meet the requirements of the MFA or the bilateral agreements that an accurate determination of market disruption precede any action to lower the quotas. This argument, too, must fail. We note, first of all, that AAEI-TAG rests on the slimmest of bases when it contends that a request for better information means that the Government's past market evaluations are inadequate. In addition, it is very doubtful that the agreements confer any private right of action even on adversely affected importers. Those agreements are between separate governments, and the relevant portions of the agreements refer to the "belief" or "view" or "opinion" of the governments themselves (in this instance, the United States). This is not the type of language investing private parties with individual rights; the whole thrust, rather, is to leave these matters within the countries' own processes of international negotiation and decision.
 
 
 40
 Most importantly, AAEI-TAG's suggestion that we review CITA's determinations that market disruption exists leads us into a field on which the judiciary is normally forbidden to tread. In a great case in this area, United States v. Curtiss-Wright Corp., 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936), Congress had authorized the President to restrict exports of arms to South America if the President determined that such a restriction would advance the cause of peace. The President issued a proclamation announcing a restriction in accordance with Congress' resolution. Curtiss-Wright contended that the President's finding did not suffice to trigger his authority under the resolution. The Supreme Court responded: "There is no suggestion that the resolution is fatally uncertain or indefinite; and a finding which follows its language, as this finding does, cannot well be challenged as insufficient." Id. at 331, 57 S.Ct. at 226. We recently dealt in Florsheim Shoe, supra, 744 F.2d at 795-96, with an international trade issue very similar to the present one, and reiterated that "Once it is determined, as we have just done, that the President's exercise of his authority ... was within his constitutionally delegated power, there is no further role for the CIT or for this court.... The President's findings of fact and the motivations for his actions are not subject to review."
 
 C
 
 41
 AAEI-TAG's procedural argument hinges on section 4 of the Administrative Procedure Act (APA), 5 U.S.C. Sec. 553 (1982), which provides:
 
 
 42
 (c) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or have actual notice thereof in accordance with law.
 
 
 43
 The section further requires that, after notice, the agency must receive comments from interested parties. 5 U.S.C. Sec. 553(d). AAEI-TAG claims that CITA violated these notice-and-comment requirements, and its actions are, therefore, void.[14]
 
 
 44
 The Government counters with 5 U.S.C. Sec. 553(a), which excludes agency action from the notice-and-comment provision "to the extent that there is involved--(1) a military or foreign affairs function of the United States." (Emphasis added.) The only two cases to consider the impact of the APA on regulations issued under the authority of section 204 have held that the notice-and-comment procedure is unnecessary on the basis of the foreign affairs exemption. Consumers Union v. CITA, Civil Action No. 74-968 (D.D.C.1975), rev'd on other grounds, 561 F.2d 872, supra; Mast Industries, Inc. v. Regan, 18 Cust.B. & Dec. No. 44 at 139, 596 F.Supp. 1567 (CIT 1984).
 
 
 45
 We agree that CITA's imposition of quotas is exempt from the APA by virtue of Sec. 553(a)(1). The purpose of the exemption was to allow more cautious and sensitive consideration of those matters which "so affect relations with other Governments that, for example, public rule-making provisions would provoke definitely undesirable international consequences." H.Rep. No. 1980, 69th Cong., 2d Sess. 23 (1946); see also, S.Rep. No. 752, 69th Cong., 1st Sess. 13 (1945). Prior disclosure of the Government's intention to trigger the agreements' consultation provisions or to impose stricter import restrictions would "provoke definitely undesirable international consequences."
 
 
 46
 First, prior announcement of CITA's intention to impose stricter quotas pending consultations creates an incentive for foreign interests and American importers to increase artificially the amount of trade in textiles prior to a final administrative determination. American importers would want to increase inventories in the face of the prospect that foreign supplies could drop below current levels. Foreign manufacturers would have a great incentive to dump (in the literal and technical senses of the word) as much merchandise as possible into the United States, since the quotas CITA imposes are based on the levels of trade in the preceding months.[15] The expansion in American imports between the date of notice and date of the final rule would exacerbate the market disruption which led CITA to act in the first place.
 
 
 47
 Second, as discussed in Part IV A and B, supra, CITA's authority derives in part from the President's foreign affairs power. The President may use his authority under section 204, through CITA, as a part of his overall foreign policy. The timing of an announcement of new consultations or quotas may be linked intimately with the Government's overall political agenda concerning relations with another country. Were we to require that CITA provide notice thirty days before they take affect, the President's power to conduct foreign policy would plainly be hampered. This is a result that should not be countenanced absent the clearest of indications from Congress. See Yassini v. Crosland, 618 F.2d 1356, 1361 (9th Cir.1980) (Immigration & Naturalization Service regulation "designed to further the policy expressed in the Presidential directive [concerning the Government's response to the hostage crisis in Iran]" exempt from notice-and-comment provision of the APA).[16]D
 
 
 48
 AAEI-TAG's due process claim likewise has no merit. A prerequisite for due process protection is some interest worthy of protecting; "We must look to see if the interest is within the [Constitution's] protection of liberty and property." Board of Regents v. Roth, 408 U.S. 564, 571, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). A protectable interest must be more than a "unilateral expectation." Id. at 577, 92 S.Ct. at 2709. Those seeking constitutional protection under the due process clause must point to a "legitimate claim of entitlement" prior to any consideration of the Government's constitutional obligations. Arnett v. Kennedy, 416 U.S. 134, 167, 94 S.Ct. 1633, 1650, 40 L.Ed.2d 15 (1974).
 
 
 49
 The importers represented by AAEI-TAG cannot do so. We have already held that no statute or international agreement gives them a proprietary interest. There is no other basis for entitlement. CITA has not taken from them any merchandise which they have already purchased. CITA has merely limited the amounts which the importers can purchase in the future. The mere subjective expectation of a future business transaction does not rise to the level of an interest worthy of constitutional protection. Perry v. Sinderman, 408 U.S. 593, 603, 92 S.Ct. 2694, 2700, 33 L.Ed.2d 570 (1972). No one has a protectable interest to engage in international trade. Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 53 S.Ct. 350, 77 L.Ed. 796 (1933); Yoshida International, supra, 526 F.2d at 580. Absent such an interest, AAEI-TAG's due process argument must fail.
 
 
 50
 For these reasons, the decision of the Court of International Trade is affirmed.
 
 
 51
 AFFIRMED.
 
 
 
 [1]
 AAEI-TAG is a trade association representing domestic importers and retailers of textile and apparel products. The American Fiber/Textile/Apparel Coalition, an association of trade organizations and unions involved in the textile and apparel industry in this country, intervened below on behalf of the Government, and has filed a brief in this court. Hilaturas Lerma, S.A., intervened as plaintiff below, but has not participated in this appeal. The Retail Industry Trade Action Coalition, an organization composed of companies in the retail trade, has filed a brief as amicus curiae urging reversal
 
 
 [2]
 The opinion is reported at 583 F.Supp. 591 (1984)
 
 
 [3]
 The Government also contests AAEI-TAG's standing to bring this suit. See Part III. infra
 
 
 [4]
 MFA, Annex A, p I states:
 The determination of a situation of "market disruption" ... shall be based on the existence of serious damage to domestic producers or actual threat thereof .... The existence of damage shall be determined on the basis of an examination of the appropriate factors having a bearing on the evolution of the state of the industry in question such as: turnover, market share, profits, export performance, employment, volume of disruptive and other imports, production, utilization of capacity, productivity and investments. No one or several of these factors can necessarily give decisive guidance.
 
 
 [5]
 Technically, the regulations at issue were promulgated by the Customs Service. Under Exec. Order No. 11,651, supra, Sec. 2(a), Customs must "take such actions as [CITA] ... shall recommend." Thus, the basic impetus for the regulations, and the responsibility therefor, rests with CITA
 
 
 [6]
 The case concerns the propriety of CITA's actions in general, not any particular action
 
 
 [7]
 See, e.g., 47 Fed.Reg. 19400 (May 5, 1982); 47 Fed.Reg. 38961 (September 3, 1982); 47 Fed.Reg. 51467 (November 15, 1982); 47 Fed.Reg. 55263 (December 8, 1982) (notices of requests for consultations with the P.R.C. on 14 categories of textiles and textile products); 47 Fed.Reg. 37606 (August 26, 1982); 47 Fed.Reg. 46877 (October 21, 1982); 47 Fed.Reg. 51467 (November 15, 1982); 47 Fed.Reg. 55263 (December 8, 1982) (directives from CITA to Customs regarding new import restrictions on the 14 categories)
 
 
 [8]
 United States Department of Commerce Solicitation No. SA-RSB-82-0011 (December 28, 1981)
 
 
 [9]
 Sec. 1581 provides:
 (a) The [CIT] shall have exclusive jurisdiction of any civil action commenced to contest the denial of a protest, in whole or in part, under section 515 of the Tariff Act of 1930.
 * * *
 (i) In addition to the jurisdiction conferred upon the [CIT] by subsections (a)-(h) of this section and subject to the exception set forth in subsection (j) of this section, the [CIT] shall have exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for--
 (1) revenue from imports or tonnage;
 (2) tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue;
 (3) embargoes or other quantitative restrictions on the importation of merchandise for reasons other than the protection of the public health or safety; or
 (4) administration or enforcement with respect to matters referred to in paragraphs (1)-(3) of this subsection and subsections (a)-(h) of this section.
 To us the Government has argued the exhaustion issue purely as a jurisdictional matter under Sec. 1581. We need not consider the effect of 28 U.S.C. Sec. 2637(d) (1982), which requires parties to exhaust administrative remedies prior to bringing an action before the CIT if "appropriate."
 
 
 [10]
 The statute still excludes from the district courts matters within the jurisdiction of the CIT. 28 U.S.C. Sec. 1340 (1982)
 
 
 [11]
 For collected cases, see Annot., 50 A.L.R.Fed. 378 (1980)
 
 
 [12]
 The Government emphasizes the Supreme Court's recent ruling in Heckler v. Ringer, --- U.S. ----, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984), but that case involves a wholly different statute (Medicare), with a different history and purpose, and accordingly supplies no helpful analogy to the current case
 Similarly, Block v. Community Nutrition Institute, --- U.S. ----, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984) turns on the specific structure of that particular Act (Agricultural Marketing Agreement Act of 1937) and its own statutory objectives.
 
 
 [13]
 AAEI-TAG supports this position by noting that the executive branch has no inherent authority to impose restraints on imports, and may do so only if so empowered by Congress. See, United States v. Yoshida International, Inc., 526 F.2d 560, 63 CCPA 15 (1975); Consumers Union of the United States, Inc. v. Kissinger, 506 F.2d 136, 148-49 (D.C.Cir.1974) (Leventhal, J., dissenting) cert. denied, 421 U.S. 1004, 95 S.Ct. 2406, 44 L.Ed.2d 673 (1975); U.S. Const., art. 1, Sec. 8, cl. 3 ("Congress shall have the power ... to regulate commerce with foreign Nations ....") From this proposition, AAEI-TAG derives the conclusion that the President must stay strictly within the terms of his statutory authorization or else exceed his constitutional powers. AAEI-TAG then infers that vigorous judicial review is appropriate to insure that the President stays within these statutory bounds
 
 
 [14]
 The Government concedes, for purposes of this appeal, that CITA's activities constitute rule-making under the APA
 
 
 [15]
 Under Annex B of the MFA, import restraints may not be less than the level of actual imports during the twelve month period ending two months prior to the month of the consultation request. If the quotas are delayed for procedural reasons, the measurement of the level of imports could shift dramatically
 
 
 [16]
 At least as early as 1967, the then pertinent executive agencies (Departments of Commerce and Labor) informed Congress that in their view, the international negotiation and administration of international agreements (including the textile program) fell within the present foreign affairs exemption in Section 4 of the APA, 5 U.S.C. Sec. 553. See Hearings in S. 518, Subcommittee on Administrative Practice and Procedure, Senate Committee in the Judiciary, 90th Cong., 1st Sess. 241, 373 (1967)