**SACILOR, ACIERIES ET LAMINOIRS DE LORRAINE, et al., Plaintiffs,**

v.

**The UNITED STATES, et al., Defendants.**

**VALLOUREC, Plaintiff,**

v.

**The UNITED STATES, et al., Defendants.**

**Court Nos. 85–5–00664, 85–5–00669.**

United States Court of International Trade.

June 21, 1985.

Donovan, Leisure, Newton & Irvine, Pierre F. de Ravel d'Esclapon, Thomas R. Trowbridge, III, and Melvin S. Schwechter, New York City, for plaintiffs.

Richard K. Willard, Acting Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Washington, D.C., Velta A. Melnbrencis, Civ. Div., U.S. Dept. of Justice, New York City, for defendants.

Stewart & Stewart, Washington, D.C. (Eugene L. Stewart, Washington, D.C., on brief), for amicus curiae Bethlehem Steel Corp.

## Opinion and Order

RESTANI, Judge:

Plaintiffs, European manufacturers of made-to-order steel pipes for crude oil pipelines, filed these actions to challenge a Department of Commerce (DOC) determination. The determination denied a request by the European Economic Community (EEC) to allow the importation into the United States of additional quantities of pipe beyond the level specified in an agreement between the EEC and the United States. Plaintiffs moved for expedited discovery and briefing. Defendant United States government opposed the motion and requested briefing on several threshold questions including jurisdiction, standing, justiciability, and judicial review. After briefing and oral argument, the court has determined that plaintiffs failed to state a cause of action under the substantive law and that judicial review of the findings of the DOC is unavailable.

### I. Background

In September, 1984, plaintiffs executed final contracts with the All American Pipeline Company to supply specially made pipe for a project designed to transport crude oil from California to the Gulf Coast. Plaintiffs were selected as suppliers after an open bidding process. On October 30, 1984, the Trade and Tariff Act of 1984, Pub.Law 98–573, 98 Stat. 2948 was enacted. Included as Title VIII of the 1984 Trade and Tariff Act was the Steel Import Stabilization Act (SISA), 19 U.S.C.A. § 2253 note (West 1980 & Supp.1985). Section 805(b) of SISA grants power to the Secretary of Commerce (Secretary) to insure that the quantities of imported pipes and tubes remain in accordance with an October 1982 agreement between the EEC and the United States, "including any modification, clarification, extension or successor agreement...."[1] Also contained within § 805(b) was a provision which permits the Secretary to allow the importation of additional quantities of certain products after the Secretary finds the existence of a short supply of the product in the United States.[2]

1. Specifically, section 805(b)(1) of Title VIII of the Trade and Tariff Act of 1984 (Steel Import Stabilization Act), Pub.Law 98–573, 98 Stat. 2948, 19 U.S.C.A. § 2253 note (West 1980 & Supp.1985) (SISA), provides in applicable part:

    In connection with the provisions of the Arrangement on European Communities' Export of Pipes and Tubes to the United States of America ... including any modification, clarification, extension, or successor agreement thereto (collectively referred to hereinafter as 'the Arrangement'), the Secretary of Commerce is authorized to request the Secretary of the Treasury to take action pursuant to paragraph (2) of this subsection whenever he determines that—

    "(A) the level of exports of pipes and tubes to the United States from the European Communities is exceeding the average of annual United States apparent consumption specified in the Arrangement, or

    "(B) distortion is occurring in the pattern of United States-European Communities trade within the pipe and tube sector....

2. Section 805(b)(3) of SISA provides:

On January 10, 1985, by way of letters, the EEC and the United States entered into a clarifying agreement concerning steel imports (the Arrangement). Under the Arrangement the EEC would restrain exports to, or destined for consumption in the United States of certain steel pipes and tubes to a level of 7.6% of U.S. apparent consumption for the years 1985 and 1986. For oil country tubular goods the limit was 10% of U.S. apparent consumption. Article 8 of the Arrangement, however, provides that pipe and tube exports above the specified limits will be accepted where a shortage of supply exists.[3]

Pursuant to the Arrangement, the EEC submitted a request to the DOC for consultation and a short supply exemption for the pipe required by the All American Pipeline project. Asking for priority treatment, the EEC claimed that the requisite product was not sufficiently available in the United States.

The DOC announced that it would examine the short supply exemption request and invited comments by February 15, 1985. 50 Fed.Reg. 4719 (1985). By letters dated March 28, 1985, the DOC informed both the EEC and the president of All American Pipeline Company that the pipe subject to the EEC's request could be supplied by three firms in the United States which had unused capacity of approximately one million tons, several times the amount of pipe covered by the requests. The DOC noted that its determination was based on responses to questionnaires sent to all U.S. producers, responses to the notice in the Federal Register, and consultations with All American Pipeline officials and their private consultant.

On May 13, 1985, manufacturers Sacilor and Bergrohr-Herne commenced an action in this court claiming that the DOC's March 28, 1985 determination was arbitrary, capricious, an abuse of discretion, and a denial of plaintiffs' due process rights. Plaintiff Vallourec filed a companion case on the same grounds.

As of June 18, 1985, it appears that the EEC and the United States have resolved their differences regarding pipes and tubes for the All American Pipeline. Defendants assert that this action is now moot. Plaintiffs have indicated that the amount approved for importation is less than that sought by plaintiffs, and therefore this action is not moot. This action remains a live controversy between the parties before the court.

## II. Jurisdiction

Jurisdiction is predicated on 28 U.S.C. § 1581(i)(4) (1982) as it relates to 28 U.S.C. § 1581(i)(3) (1982).[4] These cases involve

---

Nothing in this subsection may be construed as prohibiting the Secretary of Commerce from permitting the importation of additional quantities of specific products in cases where the Secretary determines that conditions of short supply or emergency economic situations related to market demand exist; except that a short supply or emergency economic situation shall not be considered to exist solely because domestic producers are unwilling to supply products at prices below their costs of production (as determined by the Secretary of Commerce).

**3.** Article 8 of the Arrangement provides:
The U.S. shall accept exports of pipes and tubes in addition to those permitted under section 1 and 2 where a shortage of supply is identified, i.e., where the U.S. industry is unable to meet demand in the USA for a particular product. At the request of the EEC, on the basis of information received from U.S. consumers, consultations shall take place between the EEC and the U.S. authorities. If necessary, the advice of an independent expert may be sought by either party.
The U.S. shall make a decision under this section on the basis of objective evidence from all relevant sources within a maximum of sixty days from the date of the request for consultations.
The US recognizes that priority should be given to the examination, under the "short-supply" provisions of this Arrangement, of requests concerning contracts recognized to have been already concluded between USA and EC enterprises and which are in course of execution in connection with large projects.

**4.** 28 U.S.C. § 1581(i) (1982) reads as follows:
**§ 1581. Civil actions against the United States and agencies and officers thereof**
... (i) In addition to the jurisdiction conferred upon the Court of International Trade by subsections (a)–(h) of this section and subject to the exception set forth in subsection (j) of this section, the Court of International

the administration of a law, SISA, imposing quantitative restrictions on certain steel imports. Defendant asserts that plaintiffs' claims rest only on the Arrangement, which it asserts does not have the force of law. It appears that executive international agreements, whether approved prior or subsequent to execution, have the force of law. *Cf. Weinberger v. Rossi,* 456 U.S. 25, 102 S.Ct. 1510, 71 L.Ed.2d 715 (1982); *B. Altman & Co. v. United States,* 224 U.S. 583, 32 S.Ct. 593, 56 L.Ed. 894 (1912). In any case, plaintiffs also claim that their actions arise under SISA because it incorporates various parts of the Arrangement. This court's task then is to determine whether SISA gives plaintiffs the relief they seek, or whether Article 8 of the Arrangement in some manner confers rights on the plaintiffs. Under § 1581(i) the court has power to make this inquiry. Furthermore, because plaintiffs have no reasonably available remedy under § 1581(a), failure to exhaust administrative remedies will not bar suit. *See American Association of Exporters Importers-Textile and Apparel Group v. United States,* 751 F.2d 1239, 1244–46 (Fed.Cir.1985) (hereafter *AAEI*); *see also American Institute for Imported Steel, Inc. v. United States,* 8 CIT ——, 600 F.Supp. 204, 208 (1984).

### III. Enforceable Private Rights

Section 802 of SISA states that the purpose of the act is to grant the President authority to enforce bilateral steel agreements and to condition the continuation of his authority on modernization of domestic steel production facilities. When referring in SISA to the Secretary's duties regarding the short supply exception to the quota levels set in the bilateral agreements, Congress used permissive language. Section 805(b)(3) states that the Secretary may permit importation of additional quantities of steel products into the United States. SISA contains no mandatory language regarding short supply except perhaps for a provision prohibiting a short supply determination based on unavailability of domestic steel at below cost prices. This limit on the short supply exemption is not involved here.

Although Article 8 of the Arrangement is written in mandatory terms, its terms bind only the signatory parties, the United States and the EEC. It is only the EEC which can request relief under Article 8 of the Arrangement. For an international agreement to be enforceable by private parties, either the agreement itself or the implementing legislation must contain language providing for the determination of private rights. *Dreyfus v. VonFinck,* 534 F.2d 24, 29–30 (2nd Cir.1976); 13B C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure* § 3563 (2nd ed. 1984). Unlike the case of *People of Saipan v. United States,* 502 F.2d 90 (9th Cir.1974), *cert. denied,* 420 U.S. 1003, 95 S.Ct. 1445, 43 L.Ed.2d 761 (1975) (United Nations Trusteeship Agreement created substantive rights enforceable by plaintiffs), there is no language in either Article 8 of the Arrangement or § 805(b)(3) of SISA which indicates an intention to establish direct, affirmative, and judicially enforceable rights for private parties in the position of plaintiffs.

The legislative history of SISA also fails to support plaintiffs. It states that the short supply provision is "designed to protect domestic purchasers of steel products...." H.R.Rep. No. 1156, 98th Cong., 2d Sess. 200, *reprinted in* 1984 U.S.Code Cong. & Ad.News 4910, 5220, 5317. There is no mention of guaranteeing persons in

Trade shall have exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for—

(1) revenue from imports or tonnage;

(2) tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue;

(3) embargoes or other quantitative restrictions on the importation of merchandise for reasons other than the protection of the public health or safety; or

(4) administration and enforcement with respect to the matters referred to in paragraphs (1)–(3) of this subsection and subsections (a)–(h) of this section.

the position of plaintiffs any access to United States markets.

## IV. Standing

The substantive laws of the United States provide plaintiffs no specific rights of action in this situation, but because the court has subject matter jurisdiction, review may lie under the Administrative Procedures Act (APA), 5 U.S.C. §§ 701–706 (1982). *See Chrysler Corp. v. Brown*, 441 U.S. 281, 317, 99 S.Ct. 1705, 1725, 60 L.Ed.2d 208 (1979); *Audubon Society v. Lee*, 742 F.2d 901, 911 n. 18, *reh'g denied*, 750 F.2d 69 (5th Cir.1984); *McCartin v. Norton*, 674 F.2d 1317, 1320 (9th Cir.1982); *Glacier Park Foundation v. Watt*, 663 F.2d 882, 885 (9th Cir.1981). Under 28 U.S.C. § 2631(i) (1982) plaintiffs may commence actions in this court if they are "adversely affected or aggrieved by agency action within the meaning of section 702 of title 5." "In order to assert a cognizable claim—or 'standing to sue'—under the APA, a plaintiff must demonstrate that it has suffered or will suffer 'injury in fact' sufficient to establish [constitutional] Article III standing and that the alleged injury to an interest is 'arguably within the zone of interests protected or regulated' by the statute that has allegedly been violated." *Dialysis Centers, Ltd. v. Schweiker*, 657 F.2d 135, 138 (7th Cir.1981) (*citing United States v. SCRAP*, 412 U.S. 669, 686, 93 S.Ct. 2405, 2415, 37 L.Ed.2d 254 (1975)). *See also Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978); *Florsheim Shoe Co. v. United States*, 744 F.2d 787, 790–92 (Fed.Cir.1984); *Port of Astoria, Oregon v. Hodel*, 595 F.2d 467, 474 (9th Cir.1979).

In *Australian Meat and Live Stock Corp. v. Block*, 7 CIT ——, 590 F.Supp. 1230 (1984), this court found that Australian meat exporters alleged economic injury in fact in challenging laws involving voluntary restraint agreements and quotas. The steel producers here allege similar injury as a result of SISA, and, thus, likely satisfy the constitutional aspect of the standing requirement.

The prudential, that is, the "zone of interests," aspect of standing is not as easily met. In making a "zone of interests" examination, courts generally look to the "language of the relevant statutory provisions and their legislative history." *Control Data Corp. v. Baldrige*, 655 F.2d 283, 294 (D.C.Cir.1981), *cert. denied*, 454 U.S. 881, 102 S.Ct. 363, 70 L.Ed.2d 190 (1981) (footnotes omitted). A review of the applicable statute in these cases, SISA, does not indicate that the business prospects of foreign manufacturers are protected by that act. SISA speaks only of meeting short supply situations. The legislative history of SISA's short supply provision demonstrates that the provision was enacted only to protect American firms which are consumers of steel products. H.R.Rep. No. 1156. Moreover, unlike the statute in the *Australian Meat* case, SISA does not protect importers by creating a minimum level which could not be kept *out* of the United States. Rather, the statute provides a possible exception to increase a maximum allowable level of imports based on American industry's needs.

The prudential test of standing set forth in *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 153–57, 90 S.Ct. 827, 829–32, 25 L.Ed.2d 184 (1972), however, contains alternative requirements. "The applicable 'zone' covers interests regulated as well as protected by the statute in question." *Community Nutrition Institute v. Bergland*, 493 F.Supp. 488, 492 (D.D.C.1980). The *Community Nutrition* court held that soft drink manufacturers whose products were not approved by federal school lunch regulations had standing to challenge the regulations even though the purpose of the legislation on which the regulations were based was to provide nutritious food to children. When their products were excluded from the school lunch program, the manufacturers were regulated by the relevant act. In the instant cases, plaintiffs' product is partially excluded from importation because of SISA and the agreements permitted by SISA. The foreign manufac-

turers are thus arguably regulated by the relevant statute. Accordingly, the prudential test of standing is met in these cases and plaintiffs, therefore, satisfy both standing requirements.

## V. Judicial Review

"Apart from the question of standing to sue, [the court's] inquiry into the availability of judicial review requires a separate examination of whether Congress has placed [the Secretary's] action beyond the reach of judicial cognizance." *Concerned Residents of Buck Hills Falls v. Grant,* 537 F.2d 29, 34 (3rd Cir.1976). Thus, the final question remaining is whether these cases fall within the exception to APA review for agency action committed to agency discretion by law. 5 U.S.C. § 701(a) (1982). The court finds that the type of judicial review sought by plaintiffs is unavailable in these cases.

First, these cases concern a decision by the Secretary which involves both foreign affairs and domestic matters. Congress could have set up procedures for decision-making on short supply issues which limit the Secretary's discretion and which involve no foreign affairs function, but it did not do so. Congress placed the short supply provision in a statute which is largely concerned with bilateral agreements between the United States and steel-exporting nations, and it used no words to remove the short supply decision-making function from the general process of consultation between the involved governmental bodies. Although the Arrangement includes certain minimal standards which govern the consultations on short supply, those standards are not part of the statute for the purpose of determining the scope of judicial review. *See AAEI,* 751 F.2d at 1248, *Mast Indus-*

*tries, Inc. v. Regan,* 8 CIT ——, 596 F.Supp. 1567, 1576 (1984).

■ Congress recognized the foreign affairs, discretionary nature of a short supply determination by neither setting forth in § 805(b)(3) standards which the Secretary must apply, nor requiring publication of specific findings.[5] Because it is unrestricted, § 805(b)(3) permits the Secretary to make a short supply determination by any reasonable means, including the consultations between governmental bodies envisioned in Article 8 of the Arrangement. Consultations between this government and foreign powers are foreign affairs matters. The indication in the legislative history that the purpose of § 805(b)(3) is to protect domestic purchasers does not override the permissive nature of the provision and the overall statutory scheme, which places the decision here in the foreign affairs arena.[6] Where foreign affairs and domestic matters are mixed, Congressional delegation must be broadly construed. *Florsheim Shoe Co. v. United States,* 744 F.2d 787, 793 (Fed.Cir.1984) (*citing South Puerto Rico Sugar Co. Trading Corp. v. United States,* 334 F.2d 622, 632 (Ct.Cl. 1964), *cert. denied,* 379 U.S. 964, 85 S.Ct. 654, 13 L.Ed.2d 558 (1965)).

■ Second, because the decision on short supply is part of the foreign affairs process, review is extremely limited. By law, such matters are committed to Executive discretion. *See Jensen v. National Marine Fisheries Service,* 512 F.2d 1189, 1191 (9th Cir.1975). The court cannot review the Secretary's findings; the court can only determine whether the authorizing law has been followed. *United States v. George S. Bush & Co.,* 310 U.S. 371, 379–80, 60 S.Ct. 944, 946–47, 84 L.Ed. 1259 (1940); *AAEI,* 751 F.2d at 1248; *Flor-*

**5.** DOC's use of notice and comment procedures is not an admission of the APA's applicability, as plaintiffs contend. It appears an expedient way to carry out the terms of the Arrangement. The use of similar procedures in the *Florsheim* case did not mandate broad judicial review.

**6.** Plaintiffs argue that short supply determinations are not encompassed within the foreign affairs power because Congress has instructed

the Secretary of Commerce, rather than the President, or the Secretary of State, to act on short supply requests. The Secretary of Commerce is involved in some foreign affairs matters apart from this area. *See, e.g.,* 22 U.S.C. § 2123(a)(2) (1982). Furthermore, as a cabinet officer the Secretary is subject to the direction of the President.

*sheim,* 744 F.2d at 793; *United States Cane Sugar Refiner's Ass'n. v. Block,* 69 CCPA 172, 177, 683 F.2d 399, 404 (CCPA 1982). Unlike the *Australian Meat* case, there is no dispute here regarding the scope of the Secretary's authority to act. It is undisputed that the Secretary gathered evidence on the issue of short supply and that a decision was made that relates to short supply. Thus, the court finds that the limited review allowed of the President's decision to withdraw duty-free status as to certain articles in the *Florsheim* case provides the best guide as to the scope of review here. The broader type of review sought by plaintiffs necessarily involves an impermissible intrusion into a discretionary decision-making process.

 Here, the Secretary made a decision regarding import levels following consultations with a foreign governmental entity. Although the "agency discretion" exception to APA review is quite narrow, *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971), the court finds that this matter clearly and directly involves a foreign affairs function. As such, it is committed to agency discretion. *Cf. Mast Industries, Inc. v. Regan,* 596 F.Supp. at 1580–82. Therefore, it is inappropriate for the court to review the Secretary's determination.

### VI. Due Process

In addition, plaintiffs claim that because no hearing on short supply was held, they were denied due process. "Those seeking constitutional protection under the due process clause must point to a 'legitimate claim of entitlement' prior to any considerations of the Government's constitutional obligations". *AAEI,* 751 F.2d at 1250 (*quoting Arnett v. Kennedy,* 416 U.S. 134, 167, 94 S.Ct. 1633, 1650, 40 L.Ed.2d 15 (1974) (Powell, J. concurring), *reh'g denied,* 417 U.S. 977, 94 S.Ct. 3187, 41 L.Ed.2d 1148 (1974)). As indicated, the statute, SISA, and the Arrangement give plaintiffs no rights. Furthermore, there is no generally available, protectable interest

to engage in foreign trade. *AAEI,* 751 F.2d at 1250 (*citing Norwegian Nitrogen Products Co. v. United States,* 288 U.S. 294, 53 S.Ct. 350, 77 L.Ed. 796 (1933), *and United States v. Yoshida International, Inc.,* 63 CCPA 15, 32, 526 F.2d 560, 580 (1975)). Accordingly, plaintiffs' due process claims must fail.

For the foregoing reasons, plaintiffs' actions are dismissed.

United States Court of International Trade.